JERRY HOSTENY, Appellant, v. ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Anning Johnson Company, Appellee).

First District (Illinois Workers' Compensation Commission Division)

No. 1—08—3238WC

Opinion filed December 29, 2009.

John W. Powers, of Cullen, Haskins, Nicholson & Menchetti, P.C., of Chicago, for appellant.

Michael C. Milstein and John A. Maciorowski, both of Rusin, Maciorowski & Friedman, Ltd., of Chicago, for appellee.

JUSTICE HUDSON delivered the opinion of the court:

Claimant, Jerry Hosteny, filed three applications for adjustment of claim pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2004)) for injuries he allegedly sustained while in the employ of respondent, Anning Johnson Co. Following a hearing, the arbitrator determined that claimant sustained compensable accidents on two of the three alleged accident dates. The arbitrator awarded claimant medical expenses, temporary total disability (TTD) benefits, and permanent partial disability (PPD) benefits. Respondent appealed, and the Illinois Workers' Compensation Commission (Commission) reversed. On judicial review, the circuit court of Cook County confirmed. Before this court, claimant challenges the Commission's findings that he failed to sustain his burden of proving compensable

injuries arising out of and in the course of his employment on June 4, 2004, and August 2, 2004. For the reasons that follow, we affirm.

## I. BACKGROUND

Claimant filed three applications for adjustment of claim pursuant to the Act (820 ILCS 305/1 *et seq.* (West 2004)) for injuries he allegedly sustained while in the employ of respondent on June 4, 2004 (No. 04 WC 59684), August 2, 2004 (No. 04 WC 59685), and September 15, 2004 (No. 04 WC 59686). The cases were consolidated for hearing before an arbitrator. The following evidence was presented at the arbitration hearing.

Claimant, a journeyman painter, was hired by respondent on March 3, 2004. In June 2004, claimant was assigned as the foreman at the Sunrise Assisted Living (Sunrise) jobsite. According to claimant, on June 4, 2004, while at Sunrise, he was carrying a 32-foot-long ladder "throughout the day" while painting window lintels. Claimant stated that while lifting the ladder, he heard a "popping sound" in the back of his neck. Feeling no pain, claimant finished the day. Claimant stated that upon returning home that evening, he still felt no pain. The next morning, a Saturday, claimant awoke with posterior neck pain and soreness. He returned to work the following Monday, noting that when he was working he had no symptoms. Claimant explained that it was only while relaxing at night or trying to sleep that he experienced soreness. Claimant stated that in the weeks that followed, the pain began radiating into his arm.

Claimant testified that his boss, Robert Cascio, would be present at his jobsite in person three times per week and that Cascio would contact claimant via walkie-talkie and/or telephone three to five times per day. Nevertheless, claimant admitted that he did not immediately tell anyone at work about his injury and that he did not immediately seek medical assistance. According to claimant, however, on July 13, 2004, he told Cascio that "[his] neck and [his] back was [*sic*] sore" and, other than noting he was going to see a chiropractor for his condition, that was "the end of the conversation."

On July 15, 2004, claimant treated with his chiropractor, Dr. Jack Gamble, for the first time after June 4, 2004. At that time, claimant presented his group insurance card for treatment. Dr. Gamble's initial report notes complaints of left-sided neck pain and soreness radiating into the left shoulder and left upper arm. Although Dr. Gamble's report does not reference a work injury, claimant testified that he told Dr. Gamble that he hurt himself at work lifting a 32-foot ladder. After July 15, 2004, claimant saw Dr. Gamble on July 16, July 20, July 22, July 27, and July 29, 2004, with complaints similar to those raised

during his initial visit. None of the office notes from these visits reflects that claimant reported a work accident or that his pain was brought on by work activities, and claimant continued to work regular duty during Dr. Gamble's treatment. Claimant testified that the therapy administered by Dr. Gamble provided "very little" relief.

Regarding the second alleged accident date, claimant testified that on August 2, 2004, he again picked up the 32-foot ladder while working at Sunrise and felt pain in the back of his neck. Claimant explained that the June accident differed from the August accident in that with the former he "felt a pop, no pain," whereas with the latter he "felt a pain." After the August incident, claimant continued to work that day, explaining that he "took it easy" and that the pain "went away." However, claimant testified that the pain in his neck soon spread to his left shoulder and left arm. Claimant also described cramping in the left arm and hand, and he stated that "everything started to increase in strength" and that the neck pain was "deeper." Nevertheless, claimant worked regular duty from August 2, 2004, through September 22, 2004, explaining that he only had symptoms while at home resting or trying to sleep.

Claimant admitted that at no time in June, July, or August 2004 did he ever complete an accident report. Claimant testified that he reported a work injury to Cascio on the afternoon of September 15, 2004, after he got home from work, and that Cascio suggested that respondent "frowned" upon workers' compensation claims. Claimant stated that he knew "exactly" what Cascio was telling him.

Claimant testified that on September 17, 2004, two days after speaking with Cascio, he sought treatment with Dr. John Fielder, his primary care provider. Claimant complained of soreness in the left arm and neck with forearm cramps, noting that his symptoms had been present since July. A separate notation in Dr. Fielder's note stated "painting since March," but no specific work injury or accident is referenced. Claimant was referred for a September 21, 2004, cervical MRI and a September 24, 2004, EMG/NCV. According to claimant, Dr. Fielder called him on September 22, 2004, with the results of the MRI, noting that the film showed a disc protrusion at C5—C6, a mild disc bulge at C6—C7, and a pinched nerve. Dr. Fielder issued a slip authorizing claimant off work beginning September 22, 2004. Claimant testified that he immediately called Cascio and was told that he did not need to complete any paperwork before leaving work. Claimant testified that later the same day he called Cascio again because he could not obtain treatment without authorization, explaining that Cascio may have misunderstood him. When Cascio asked what he meant, claimant responded that he got hurt at work. Cascio replied,

"You did? When did it happen?" Claimant responded that it was on June 4, 2004, and August 2, 2004.

The EMG/NCV showed advanced left carpal tunnel syndrome, but reflected no evidence of radiculopathy, and claimant was referred to pain specialist Dr. Maunak Rana. Claimant saw Dr. Rana on September 28, 2004, noting a recent history of cervical spine pain radiating down his left upper extremity with occasional numbness in the forearm and first three fingers. Claimant told Dr. Rana that he was injured on June 4, 2004, and August 2, 2004, while "carrying a 32-foot ladder at work throughout the day and fe[eling] discomfort." Claimant related that "staying busy and moving helps him and when he is lying in bed and in idle positions, his symptoms are worsened." Dr. Rana diagnosed cervical radiculitis, facet syndrome, a herniated cervical disc, and myofascial pain. Dr. Rana recommended various injections. During his consultation with Dr. Rana, claimant asked Dr. Rana "whether or not his accident caused his pain or whether this would be a pre-existing condition." Dr. Rana responded that he was unable to answer that inquiry, and he referred claimant to Dr. Fielder, who could compare claimant's condition before and after the accidents.

On October 5, 2004, claimant called Dr. Rana regarding the results of his EMG/NCV. Claimant questioned how that test failed to indicate radiculopathy given the MRI results. Dr. Rana told claimant to speak to Dr. Chulsoo Kim, who performed the EMG/NCV, "to find out whether this is an acute or chronic condition, since it is specifically not dictated as to that effect and to ask him about the fact that there is no evidence of any cervical radiculopathy present, given the findings on MRI." Dr. Rana also told claimant to contact Dr. Fielder about what his next options would be. During the call, claimant also told Dr. Rana that Dr. Fielder indicated that Dr. Rana should fill out his disability form. Dr. Rana told claimant that he only met him after his accident and thus was unable to comment as to the degree of disability he had, suggesting that he contact Dr. Fielder to determine how his health changed after this particular injury. One of Dr. Fielder's progress notes references a telephone call from claimant's wife, who called from the office of claimant's attorney on October 5, 2004. During the call, claimant's wife related that Dr. Rana did not note a pinched nerve on the EMG. At that time, claimant was referred to neurologist Dr. Mohamed Ghumra. Claimant stated that Dr. Fielder has since, at claimant's request, opined claimant's surgical condition was work related on an October 14, 2004, temporary disability form.

Dr. Ghumra's October 12, 2004, report notes, per the history from claimant and his wife:

"[I]t appears that [claimant] was carrying a 32-feet [*sic*] ladder at work and has been working on his regular schedule. On 06/04/04 and the subsequent day and 08/02/04, he had two separate work-related injuries. He states that he injured his neck and started experiencing some pain radiating down to his left shoulder and all the way down to his hand. His hand also started becoming numb and tingly."

Dr. Ghumra noted that despite treatment, including visits to a chiropractor and epidural injections, claimant still complained of persistent pain and radicular-like symptoms. Dr. Ghumra diagnosed cervical radiculopathy based on claimant's symptoms and the MRI results, noting that if continued treatment with Dr. Rana failed, he should see a neurosurgeon.

Claimant continued to treat with Dr. Rana into 2005 before seeking treatment with Dr. James Fister. Prior to presenting for an evaluation with Dr. Fister, claimant dropped off various films and records for review. Upon reviewing these documents, Dr. Fister indicated that if claimant has left-sided C6 radicular symptoms and if his symptoms are bad enough that he wants surgery, "then he is a candidate for C5—6 anterior cervical discectomy and fusion." After a review of Dr. Rana's records, Dr. Fister stated that "[a]pparently [claimant] was asking [Dr. Rana] whether his symptoms were due to his accident or pre-existing so we have workcomp issues involved here." Dr. Fister physically examined claimant on February 9, 2005. Dr. Fister's intake form from February 9, 2005, noted an injury/accident of "June & August 2004" while "lifting 32[-foot] ladder at work." Claimant reported to Dr. Fister primarily left-sided pain of the shoulder, scapula, and arm. Claimant reported that the first time he noticed an abnormality was "probably in June 2004 when he was at work as a painter and he turned his neck and felt a sudden crack or pop in the neck and then gradually after that he developed these symptoms going down the left upper extremity." Dr. Fister diagnosed a disc herniation on the left side at C5—6 and recommended surgery.

Seeking another opinion, claimant saw Dr. Antonio Yuk on February 14, 2005. The intake form from Dr. Yuk's office indicates the date and location of injury as "June 2004 worksite," with further explanation stating "June 2004 lifted 32 foot ladder throughout day. Felt crack/pop in neck resulting in soreness, pain, cramping, numbness in left arm/hand, shoulder blade [and] neck." A separate note in a different handwriting on the intake form states "reported to boss in September." According to Dr. Yuk's report, claimant stated:

"[He was] carr[ying] a 32 foot ladder all day long in June of 2004. He felt a 'pop' in the neck and noticed soreness in the neck

later. Steadily, he felt that he had pain running down his left arm. He also describes discomfort in the left shoulder blade. He initially thought that he simply pulled a muscle. His symptoms lingered until it was further aggravated when he carried that same ladder again. He finally reported the problem to his supervisor in September."

Dr. Yuk diagnosed C5—C6 disc herniation. Dr. Yuk noted that "according to the history that I have, [claimant] did not have a significant neck problem until he carried a 32 foot ladder all day in June of 2004."

On March 15, 2005, Dr. Yuk performed an anterior discectomy and fusion at C5—C6. Dr. Yuk released claimant to restricted duty on or about June 8, 2005, with a 30-pound weight limit. Claimant returned to work on June 20, 2005, and worked for a period of time before being temporarily laid off for three weeks. Thereafter, claimant again returned to work before being laid off again in September 2005. Claimant remained off work through the October 13, 2005, arbitration hearing. Claimant applied for and was receiving unemployment, retroactive to September 11, 2005. Claimant testified that he had no neck or shoulder problems prior to June 4, 2004, and has not been involved in any non-work-related accidents since. Claimant related that when he is not working he is in "constant" pain, which he described as "pinching" in the back of his neck and across the shoulder blades.

Respondent's section 12 (see 820 ILCS 305/12 (West 2004)) examining physician, Dr. Marshall Matz, saw claimant on May 13, 2005. At that time, claimant reported carrying a 32-foot ladder on June 4, 2004, throughout the day as he was painting multiple windows, when he felt and heard an audible "crack" in his neck. Claimant reported no further symptoms that day except for a "little bit of pain in back of the neck going down into the left arm by that night." Dr. Matz noted claimant "is a vague historian and difficult to pin down as to the timing of many of his symptoms, which he in general is of the recollection that over time, his symptoms got worse. He believes that it was sometime in June and/or July that he began to have cramping pain about his neck and left arm." Dr. Matz's notes further reflect that "[o]n August 2, 2004, [claimant] was again painting and using a ladder when he alleges more pain in back of his neck. By September of last year, his pain was described as 'more intense and cramping,' so he called [Dr. Fielder]." Dr. Matz examined claimant and reviewed his medical records and films. Dr. Matz opined that the medical records "clearly raise issues as to the onset of symptoms being related to some sort of work related trauma," noting that only in the latter treatment records are there references to two occurrences at work. Ultimately, Dr. Matz concluded that claimant had a left-sided disc herniation at

C5, but that this condition was not causally related to his employment "[b]ased on the lack of a contemporaneous history of neck complaints or injury" in the medical records.

On cross-examination, claimant was asked whether he visited Dr. Fielder on July 22, 2004, and August 25, 2004. Claimant responded that he was "not aware of that." Claimant was also asked whether he was aware of the fact that the records from Dr. Fielder for those two dates do not record any history of an accident. Claimant responded that he "saw [Dr. Fielder] on September 17th, [and] told him [he] hurt [him]self lifting a ladder at work." Regarding the lack of history of a work accident in Dr. Fielder's September 17, 2004, report, claimant stated that he "can't write for [the doctor]." Regarding Dr. Yuk's February 10, 2005, physician's intake sheet and his February 14, 2005, report, which indicated claimant did not report the injury to respondent until September 2004, claimant stated: "I'm not aware of that. I told every doctor I hurt myself at work. I told Bob Cascio 3 times."

Claimant also testified on cross-examination that he previously pursued a workers' compensation claim with an accident date of October 3, 2000. Relative to the October 3, 2000, claim, when claimant saw his physician on October 17, 2000, he gave a history of an accident at work on October 3, 2000. Claimant acknowledged that he was off work for a period of 24 weeks for that incident and that he was awarded PPD benefits based on a 40% loss of use of the right leg. Claimant testified that he could not recall receiving a company handbook upon hire by respondent. Claimant also admitted that he did not testify as to any specific event occurring on September 15, 2004, at work.

Robert Cascio, respondent's painting field superintendent, testified that claimant received a company handbook and saw a safety video when he was hired in March 2004. The handbook and the video instruct workers to immediately notify a supervisor of any work-related accident and to complete an accident report. Cascio agreed that claimant was assigned to work at the Sunrise jobsite in June 2004. Cascio testified that he (Cascio) would be at that jobsite at least 3 times a week from June through September 2004, sometimes daily, for 30 to 60 minutes at a time. In addition, Cascio would communicate with claimant at least three times daily via two-way radio in the morning, noon, and evening.

Despite this regular contact, Cascio indicated that claimant never advised him of or complained of any neck or shoulder condition between June 4 and September 14, 2004. In fact, Cascio stated that claimant worked full duty and carried out all aspects of his job during

that time. Cascio testified that he had no knowledge from any source of claimant being hurt at work prior to a September 22, 2004, conversation with claimant. Moreover, Cascio denied that claimant ever called him on July 13, 2004, to indicate his neck and shoulder were hurting. According to a note Cascio took on September 22, 2004, claimant called him the morning of Wednesday, September 15, 2004, stating that he had some arm problems and was going to see a doctor. At that time, claimant gave no indication the condition was related to a work accident. Claimant worked on September 16 and 17, and next discussed his medical condition with Cascio on September 22, 2004. On that date, claimant said his doctor called and told him he had a herniated disc and was to stop working immediately. Claimant asked if any paperwork needed to be filled out, and Cascio responded in the negative. Claimant called back later that afternoon and said his doctor "could not proceed" without paperwork. Cascio asked claimant what type of paperwork he was talking about, and claimant indicated that Cascio had apparently misunderstood him and that it involved a work-related incident. Cascio testified that was the first time he was notified of any alleged work-related incident. When he asked claimant when he had been hurt, claimant indicated that "it must have happened while carrying a 32[-foot] ladder while working [at the Sunrise job site]." When Cascio asked claimant if he felt anything or if a specific incident had occurred, claimant said, "[n]o, but it must have been when I was carrying that 32-foot ladder." Based on claimant's account, Cascio indicated that he did not believe that the condition was work related, but he gave the information to respondent's insurer to make the determination. Cascio could not recall if claimant provided a specific accident date. Cascio explained that he did not complete an accident report because he "was not notified of an accident." When Cascio discussed the situation with his supervisor, Gerry Ginter, Ginter asked Cascio if there had been a documented accident, date of accident, or accident report, and when Cascio told him no, Ginter suggested to Cascio that claimant contact his union's group insurance. However, Cascio denied telling claimant not to report his condition as work related or to process the claim through group insurance.

The arbitrator issued a separate decision for each of the three applications for adjustment of claim filed by claimant. With respect to the June 4, 2004, accident date, the arbitrator concluded that claimant sustained his burden of proving an accident that arose out of and in the course of his employment with respondent. The arbitrator found that claimant "credibly testified" regarding the events surrounding that accident and that his account was "substantiated" by the histories in claimant's medical records. In particular, the arbitrator

noted that claimant sought treatment with Dr. Gamble with respect to his neck and left shoulder, claimant testified that he had no prior condition involving his neck and shoulder, and the medical records of Drs. Fielder and Fister support claimant's account. The arbitrator further determined that claimant "credibly testified" that on July 13, 2004, he told his supervisor that he was feeling neck and shoulder pain and that he was going to see a chiropractor. The arbitrator noted that claimant sought medical treatment involving his condition two days later and that claimant testified that his supervisor told him to process his medical bills through his group insurance.

With respect to the August 2, 2004, accident date, the arbitrator also concluded that claimant sustained his burden of proving an accident which arose out of and in the course of his employment with respondent. Again, the arbitrator found that claimant "credibly testified" regarding the events surrounding that accident and that his account was "substantiated" by the histories in claimant's medical records. The arbitrator classified the injury of August 2, 2004, as an "intervening accident," which was the cause of claimant's current state of ill-being. The arbitrator further determined that claimant "credibly testified" that on September 15, 2004, he told his supervisor that he injured his neck, shoulder, and left arm, and that he wanted to see a physician. In support, the arbitrator noted that claimant sought medical treatment involving his condition two days later and that claimant testified that his supervisor told him to process his medical bills through his group insurance.

The arbitrator determined that claimant failed to prove that he sustained a compensable injury on September 15, 2004. In particular, the arbitrator noted that on cross-examination, claimant admitted that he did not suffer a new accident on that date. The arbitrator therefore found that claimant is not entitled to medical expenses, TTD, or a permanency award with respect to this alleged injury. However, with respect to the other two claims, the arbitrator awarded reasonable and necessary medical expenses, 38⁴/₇ weeks of TTD, and 200 weeks of PPD, representing 40% loss of use of a person as a whole. Thereafter, respondent appealed the arbitrator's findings with respect to the accident dates of June 4, 2004, and August 2, 2004.

In two separate decisions, a majority of the Commission reversed. The Commission found that claimant failed to prove that he sustained accidental injuries arising out of and in the course of his employment on June 4, 2004, or August 2, 2004. The Commission noted that claimant's medical records do not disclose any evidence of a work-related injury on June 4, 2004, or August 2, 2004, until September 28, 2004. In addition, the Commission noted that while claimant contacted

his supervisor in mid-July 2004 to report a sore neck and back, claimant admitted that he did not indicate that his condition was work related. The Commission determined that claimant did not inform respondent that he was injured at work until September 22, 2004, more than three months after the initial incident. Furthermore, when claimant did inform respondent, he offered only speculation as to the occurrence of the accidents instead of relating them to specific incidents. The Commission concluded that claimant did not claim his neck condition was work related until after he was told that he had a pinched nerve and had to be off work. As such, the Commission found that claimant's testimony was not credible and it denied benefits. Commissioner DeMunno dissented. He would have affirmed and adopted the arbitrator's decision in its entirety.

Thereafter, claimant appealed the Commission's decisions. The appeals were consolidated for review before the circuit court of Cook County. Following oral arguments, the trial court confirmed the decisions of the Commission on the basis that they were not against the manifest weight of the evidence. Respondent then filed the appeal before us.

## II. ANALYSIS

On appeal, claimant argues that the Commission's finding that, based on a lack of credibility, he failed to prove that he sustained an accident on either June 4, 2004, or August 2, 2004, is contrary to law. The purpose of the Act is to protect employees against risks and hazards which are peculiar to the nature of the work they are employed to do. *Illinois Bell Telephone Co. v. Industrial Comm'n,* 131 Ill. 2d 478, 483 (1989). An injury is compensable under the Act only if it "arises out of" and "in the course of" one's employment. 820 ILCS 305/2 (West 2004). Both elements must be present at the time of the employee's injury in order to justify compensation, and it is the employee's burden to establish these elements by a preponderance of the evidence. *Rodin v. Industrial Comm'n,* 316 Ill. App. 3d 1224, 1226 (2000). The determination of whether an injury arose out of and in the course of one's employment is generally a question of fact. *Ghere v. Industrial Comm'n,* 278 Ill. App. 3d 840, 847 (1996). In resolving questions of fact, it is within the province of the Commission to assess the credibility of witnesses, resolve conflicts in the evidence, assign weight to be accorded the evidence, and draw reasonable inferences from the evidence. *Ghere,* 278 Ill. App. 3d at 847. We will not overturn the decision of the Commission regarding whether an injury arose out of and in the course of employment unless the Commission's decision is found to be contrary to the manifest weight of the evidence. *Jensen*

*v. Industrial Comm'n*, 305 Ill. App. 3d 274, 277-78 (1999). A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *Westin Hotel v. Industrial Comm'n*, 372 Ill. App. 3d 527, 539 (2007).

Prior to addressing the merits of claimant's argument, we find it necessary to discuss claimant's suggestion that we abandon the deferential standard of review outlined above in favor of a stricter standard when the Commission's credibility findings are contrary to those of the arbitrator. In *Cook v. Industrial Comm'n*, 176 Ill. App. 3d 545, 552 (1988), this court stated that "in cases where the Commission has rejected the arbitrator's factual findings without receiving any new evidence, [the reviewing court applies] an extra degree of scrutiny to the record in determining whether there is sufficient support for the Commission's decision." *Cook*, 176 Ill. App. 3d at 552. However, this holding has since been repudiated in almost every reported case that has cited it. See *Boatman v. Industrial Comm'n*, 256 Ill. App. 3d 1070, 1071 (1993) (noting that *Cook* has been rejected "as an incorrect statement of the law"); *J&J Transmissions v. Industrial Comm'n*, 243 Ill. App. 3d 692, 700 (1993) (holding that *Cook* "is not an accurate statement of the law"); *Hartsfield v. Industrial Comm'n*, 241 Ill. App. 3d 1055, 1060 (1993) ("the statement in *Cook* regarding an extra degree of scrutiny is not a standard of review recognized by this court"); *Wagner Castings Co. v. Industrial Comm'n*, 241 Ill. App. 3d 584, 594 (1993) (declining the employer's invitation to give an extra degree of scrutiny to the Commission's decision where the Commission overturned the arbitrator's decision without hearing any new evidence); *Komatsu Dresser Co. v. Industrial Comm'n*, 235 Ill. App. 3d 779, 788 (1992) (same); *Dillon v. Industrial Comm'n*, 195 Ill. App. 3d 599, 607 (1990) ("Regardless of whether the Commission hears testimony in addition to that heard by the arbitrator, it exercises original jurisdiction and is in no way bound by the arbitrator's finding"). Moreover, our supreme court has consistently held that when the Commission reviews an arbitrator's decision, it exercises original, not appellate, jurisdiction and that the Commission is not bound by the arbitrator's findings. See, *e.g.*, *Franklin v. Industrial Comm'n*, 211 Ill. 2d 272, 279 (2004); *Paganelis v. Industrial Comm'n*, 132 Ill. 2d 468, 483 (1989); *Berry v. Industrial Comm'n*, 99 Ill. 2d 401, 405 (1984); *Zarley v. Industrial Comm'n*, 84 Ill. 2d 380, 386 (1981).

Claimant directs us to our recent decision in *S&H Floor Covering, Inc. v. Workers' Compensation Comm'n*, 373 Ill. App. 3d 259, 268 (2007). However, *S&H Floor Covering* did not resurrect the extra-degree-of-scrutiny standard referenced in *Cook*. In *S&H Floor Cover-*

*ing,* the employer urged us to reconsider precedent that the Commission is not required to give deference to the arbitrator's findings regarding credibility. We responded that it "may very well be time to reconsider the Commission's prerogative to determine credibility regardless of the arbitrator's decision." *S&H Floor Covering,* 373 Ill. App. 3d at 267. We then reviewed *Cook* and referenced the cases departing from that decision before concluding that we would "consider giving credence" to *Cook. S&H Floor Covering,* 373 Ill. App. 3d at 268. However, we did not actually determine the viability of *Cook*'s extra-degree-of-scrutiny standard as it was unnecessary for us to do so. *S&H Floor Covering,* 373 Ill. App. 3d at 268. In any event, as the overwhelming weight of authority cited above suggests, *Cook* is a misstatement of the appropriate standard of review. Accordingly, we decline to apply to this case the extra-degree-of-scrutiny standard referenced in *Cook.*

As noted above, to be compensable, an injury must both "arise out of" and "in the course of" one's employment. 820 ILCS 305/2 (West 2004); *Rodin,* 316 Ill. App. 3d at 1226. The "in the course of" element refers to the time, place, and circumstances under which the accident occurred. *Dodson v. Industrial Comm'n,* 308 Ill. App. 3d 572, 575 (1999). An injury is said to "arise out of" one's employment when there is a causal connection between the employment and the injury; that is, the origin or cause of the injury must be some risk connected with the claimant's employment. *Brady v. Louis Ruffolo & Sons Construction Co.,* 143 Ill. 2d 542, 548 (1991). Typically, an injury arises out of one's employment if, at the time of the occurrence, the claimant was performing acts the employer instructed the claimant to perform, acts incidental to the claimant's assigned duties, or acts which the claimant had a common law or statutory duty to perform. *Caterpillar Tractor Co. v. Industrial Comm'n,* 129 Ill. 2d 52, 58 (1989).

In this case, the arbitrator found that claimant "credibly testified" regarding the events surrounding the June 4, 2004, and August 2, 2004, accidents, and therefore awarded claimant benefits. A majority of the Commission, however, disagreed, concluding that claimant's testimony regarding the accidents lacked credibility and that he therefore failed to sustain his burden of proving that his injuries arose out of and in the course of his employment. Claimant insists that the Commission's finding that he lacked credibility is contrary to law. According to claimant, the evidence upon which the Commission relied is insufficient to support a finding that his testimony was not credible. Claimant further asserts that his testimony was "uncontradicted." As such, he maintains that the Commission, as the trier of fact, was without discretion to discount his testimony unless it was impeached,

contradicted by positive testimony or circumstances, or found to be inherently improbable. See *People ex rel. Brown v. Baker*, 88 Ill. 2d 81, 85 (1981). We disagree.

We find that there was sufficient factual evidence in the record to support the Commission's decisions. Although an employee's testimony about an alleged accident might be sufficient, standing alone, to justify an award of benefits under the Act, it is not enough where consideration of *all* facts and circumstances demonstrate that the manifest weight of the evidence is against it. *Caterpillar Tractor Co. v. Industrial Comm'n*, 83 Ill. 2d 213, 218 (1980). As we observe below, portions of claimant's testimony were contradicted by the record. Significantly, claimant's medical records contemporaneous to June 4, 2004, and August 2, 2004, do not reference claimant reporting a work injury. Following the alleged injury of June 4, 2004, claimant did not seek medical treatment for almost six weeks. When claimant finally saw his chiropractor, Dr. Gamble, on July 15, 2004, Dr. Gamble's progress notes do not mention a work injury. Claimant saw Dr. Gamble on five additional dates in July, but the progress notes for those dates do not mention any link to a work-related accident either. While claimant insists that he reported a work-related injury to Dr. Gamble, it is curious that, despite having had prior experience with the workers' compensation system, claimant did not request Dr. Gamble to process his treatment as a workers' compensation claim. Further, while claimant testified that Cascio told him to process his claim under group insurance, the record reflects that this information was related to claimant, if ever, in September 2004, two months after his treatment with Dr. Gamble.

The record also reflects that claimant contacted his primary-care physician, Dr. Fielder, on July 22, 2004, and August 25, 2004, yet made no mention of any work-related injury. Claimant saw Dr. Fielder on September 17, 2004, but Dr. Fielder's notes of that date do not reference any specific incident involving claimant carrying or lifting a ladder or being injured while performing work activities. In fact, the only reference to work in Dr. Fielder's notes is a vague comment that claimant had been "painting since March." On September 22, 2004, after reviewing some diagnostic films, Dr. Fielder issued an off-work slip. However, it was not until September 28, 2004, six days later, that claimant's medical records indicate that he reported an accident at work when he treated with Dr. Rana. The Commission could easily find that given claimant's prior experience with the workers' compensation system, the delay in reporting the alleged accidents to his employer and physicians belie the veracity of his testimony.

The Commission also pointed to other evidence that reflected upon the lack of claimant's credibility. The Commission noted that claimant and Cascio were in frequent contact, both in person and via two-way radio. Given the frequency of contact, claimant would have had many opportunities to report a work-related accident to his employer. Yet, according to Cascio, he first became aware of claimant's allegation of an injury at work on September 22, 2004, more than 15 weeks after the alleged June 2004 incident and more than seven weeks after the alleged August 2004 incident. Cascio's testimony that he was not informed by claimant of a possible work-related injury until September 2004 is supported by the intake form claimant completed for Dr. Yuk.

Moreover, when claimant finally told Cascio that he believed that his condition was work related, claimant was unable to link his condition to a specific incident at work. Notably, when Cascio asked claimant if he felt anything or if a specific incident had occurred, claimant responded, "[n]o, but it *must have been* when I was carrying that 32-foot ladder." (Emphasis added.) Claimant's conversation with Cascio is inconsistent with his testimony at the arbitration hearing, where he expressly stated that while lifting a ladder on June 4, 2004, he heard a "popping sound" and while lifting a ladder on August 2, 2004, he felt pain. Claimant did testify to a conversation with Cascio on July 13, 2004. Claimant alleged that during that conversation, he told Cascio that he was going to see a chiropractor because his neck and back were sore. Cascio denied that any such conversation took place. However, even if it did, the details of the conversation do not support a finding that claimant told Cascio that his condition was *work related*. In fact, claimant admitted at the arbitration hearing that all he reported to Cascio was that his neck and back were sore and nothing more.

In short, while there was no witness testimony that an accident did not occur on either June 4, 2004, or August 2, 2004, there was other evidence in the record inconsistent with claimant's testimony that he sustained a work-related injury on either of those dates. In particular, that evidence indicates that: (1) claimant did not report a work-related accident to any of his medical providers until September 28, 2004; (2) despite his experience with the workers' compensation system, claimant processed his initial treatment using a group insurance card; (3) claimant did not report a work-related accident to respondent until September 22, 2004; and (4) when claimant informed respondent that his condition was work related, he was unable to link the condition to a specific date. As we stated previously, in resolving questions of fact, it is within the province of the Commission to assess the credibility of witnesses, resolve conflicts in the evidence, assign

weight to be accorded the evidence, and draw reasonable inferences from the evidence. *Ghere*, 278 Ill. App. 3d at 847. In this case, the Commission, after considering the conflicting evidence, determined that claimant failed to sustain his burden of proving that his injuries arose out of and in the course of his employment. Based on the record before us, we cannot say that an opposite conclusion is clearly apparent.

## III. CONCLUSION

The Commission's findings that claimant failed to prove by a preponderance of the credible evidence that he sustained accidental injuries arising out of or in the course of his employment with claimant on June 4, 2004, or August 2, 2004, are not contrary to the manifest weight of the evidence. Accordingly, we affirm the judgment of the circuit court of Cook County, which confirmed the decisions of the Commission.

Affirmed.

McCULLOUGH, P.J., and HOFFMAN, HOLDRIDGE, and DONOVAN, JJ., concur.