NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

FILED
September 21, 2020
Carla Bender
4th District Appellate Court, IL

**NOTICE:** This order was filed under Supreme Court Rule 23 and may no precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 190817WC-U

Order filed

_____

IN THE

APPELLATE COURT OF ILLINOIS

FOURTH DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION

_____

| | | |
|---|---|---|
| CITY OF SPRINGFIELD, | ) | Appeal from the Circuit Court |
| | ) | of Sangamon County, Illinois |
| Appellant, | ) | |
| | ) | Appeal No. 4-19-0817WC |
| v. | ) | Circuit No. 19-MR-117 |
| | ) | |
| THE ILLINOIS WORKERS' | ) | |
| COMPENSATION COMMISSION *et al.* | ) | Honorable |
| | ) | Adam Giganti, |
| (Rick L. Shelton, Appellee.) | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE HOLDRIDGE delivered the judgment of the court.
Justices Hoffman, Hudson, Cavanagh, and Barberis concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*: The Commission's findings that the claimant (1) provided his employer with notice of a work-related accident within 45 days, (2) sustained a work-related accidental injury on March 24, 2015, and (3) suffered an injury to his right elbow from the accident were not against the manifest weight of the evidence.

¶ 2                    I. INTRODUCTION

¶ 3    The employer, City of Springfield (City), appeals a decision of the Illinois Workers' Compensation Commission (Commission) awarding the claimant, Rick L. Shelton, certain benefits under the Illinois Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West

2014)). The Commission, with one dissenting commissioner, affirmed and adopted the decision of the arbitrator. The City sought review of the Commission's decision before the circuit court of Sangamon County. The court confirmed the Commission's decision. The City appeals.

¶ 4                                    II. BACKGROUND

¶ 5     The following factual recitation is taken from the evidence presented at the arbitration hearing conducted before Arbitrator Maureen Pulia on January 11, 2018.

¶ 6                          A. The Claimant's Testimony

¶ 7     The claimant testified that he was employed by the City as a truck driver and laborer, and his duties included trimming and removing trees and limbs. At the time of the hearing, he was 57 years old. On March 24, 2015, the claimant was working with the forestry crew and was called to a worksite at 18th Street and Capitol Avenue. The foreman at the jobsite was Larry Long. When the claimant arrived at the worksite, there was a 45-foot tall, 70-inch diameter oak tree that his crew was instructed to remove. After the crew removed the branches, the remaining 14-foot trunk was cut down and placed on the ground. The trunk was so heavy that it had to be cut in half before being loaded in the truck for removal.

¶ 8     The claimant was responsible for cutting the trunk in half with a 25-inch steel chainsaw. The claimant located the middle of the trunk and began to cut the trunk using both of his hands on the chainsaw while his knees were on the ground. He started at the top and moved the saw down on the other side before bringing the saw back so that it could get through the entire trunk. He used a finger on his right hand to press the trigger on the saw. While he was cutting through the trunk, he noticed it was going to lunge forward. His right arm was extended, and he was pulling the saw backwards while twisting his arm outward. This caused his palm to face upwards and his forearm and elbow to face downwards. Once he saw the trunk was going to come towards him, his right

- 2 -

arm hit the ground and he took his finger off the trigger. As he did this, his arm rolled back up and the second half of the trunk rolled onto the dorsal part of his right hand, taking his glove off in the process. The claimant felt immediate numbness and tingling in the dorsal part of his right hand.

¶ 9    The claimant stated that Long was about four feet away from him while he was cutting the trunk in half and could see what was going on. He stated that Long knew that the trunk had hit the dorsal part of his hand and that he experienced numbness and tingling in that area. The claimant and his crew cleaned up the work area and went back to the shop since it was close to lunchtime. He did not report the incident at that time because he thought it would get better. However, the claimant stated he believed he reported the incident to Sean Haynes, the supervisor of the tear out crew and concrete crew, later that day. He also stated he reported this incident to Brad O'Neal, the City's safety technician, about three weeks before he decided to seek treatment at a prompt care clinic on May 13, 2015. Following his visit to the prompt care clinic, in May of 2015, the claimant stated that he filled out paperwork for the City, indicating that he injured three fingers on his right hand. He did not provide a specific accident date, only an injury date of sometime in May of 2015 because that was when he first sought treatment.

¶ 10    On February 9, 2016, the claimant underwent a right cubital tunnel release and also received an injection of 40mg of Kenalog. He received a return to work date of February 29, 2016, with no restrictions. At the time of the hearing, he had not received any temporary total disability (TTD) benefits for the time he was off work following his surgery. He also stated that he has not sought any treatment since being released to return to work on February 29, 2016, which was nearly two years ago. Since the surgery, the claimant had not experienced any tingling or numbness, but his strength was less and his right arm fatigued easier. He stated that it was harder for him to do repetitive activities and it was still uncomfortable to use power equipment or work

overhead with his arms extended. The claimant reported weakness with these activities. He stated that he used his left hand if he had to hold anything heavy for an extended period of time.

¶ 11    The claimant offered into evidence a work order for the forestry department to remove an oak tree on March 24, 2015, located on Capital Avenue.

¶ 12                                    B. Haynes's Testimony

¶ 13    Haynes testified that he was in charge of the forestry take down crew in the spring of 2015. He stated that, neither in March of 2015 nor in the spring of 2015, did the claimant report an injury to him. Haynes stated that he would check on the crews twice a day and saw them at the beginning and end of each day. He spoke to Long after he received notice of this hearing, and Long told him that the claimant mentioned to him that he was hurt. This was the first time Haynes spoke to Long about this incident. Haynes stated that Long was the claimant's supervisor on the date in question and that, if the foreman witnessed an accident, he or she would report the injury to O'Neal and fill out the proper paperwork. He denied that he knew anything regarding the claimant's alleged injury on March 24, 2015, or the 45 days that followed.

¶ 14                                    C. O'Neal's Testimony

¶ 15    O'Neal testified that, when there is a work injury, the employee has to report the injury to his or her supervisor. If the supervisor is not available, the employee should go to him to complete the paperwork. O'Neal stated that he never received any paperwork from Haynes regarding the claimant's accident. He also stated that, when an employee is injured but does not want treatment, a "Supervisor Notification of Possible Injury Form" is completed to document the injury in case the employee later needs treatment. He stated that this form was not filled out in this case. O'Neal described a sign-in/sign-out sheet the employees fill out each day. There is a question that the employees are to answer as to whether they sustained an injury that day. O'Neal stated that a lot

- 4 -

of the times the question is not answered, and there had been discussions to remove the question from the form because some employees may not know they were injured until after the actual date of injury because they do not have symptoms right away. He could not say whether the claimant answered this question on his sign-in/sign-out form on March 24, 2015.

¶ 16    O'Neal stated that the claimant's paperwork was eventually completed on October 19, 2015, and he identified the date of the accident as May of 2015. The claimant was not asked to obtain any witness statements, and O'Neal was unsure if any witnesses were listed. He also stated that Long was the claimant's supervisor on March 24, 2015, and he was never interviewed. O'Neal had no reason to believe that the claimant's accident did not occur as he had claimed.

¶ 17    O'Neal recalled a conversation with the claimant in 2015 that took place "in April or early May, but *** probably sometime [at] the end of April or - yeah, sometime in the middle of April, end of April." He later said that it "[c]ould have been May of 2015." O'Neal stated that the claimant told him during this conversation that he was going to go to a prompt care clinic for treatment. He could not recall whether the claimant discussed his symptoms. He assumed it was not work related because he did not have any paperwork for the claimant regarding a work-related accident. However, O'Neal agreed that there would be no reason for the claimant to check in with him, as safety technician, to tell him he was seeking medical treatment if he was not hurt at work.

¶ 18    Nonetheless, O'Neal stated that, if he had been told it was a work-related injury, he would have had the claimant fill out the appropriate paperwork. He questioned why the paperwork was not filled out on the date of the injury, but also noted that was not the first incident of paperwork not being completed when an injury occurred.

¶ 19                                    D. The Medical Evidence

¶ 20                                    1. The Claimant's Treatment History

¶ 21 On May 13, 2015, the claimant presented to Dr. Rishi Sharma at Springfield Clinic for right hand pain and discomfort for about six weeks. He reported that he worked for the City and was cutting down a tree and caught his hand between tree trunks. The claimant stated that he came in for further evaluation and recommendation. He noted the ulnar side of his right hand around the fifth metacarpal at the metacarpophalangeal (MCP) joint. The claimant stated that using it made it feel worse. He noted that resting helped but the pain limited him and impeded his activities of daily living. The claimant denied any previous fractures or dislocations of the right hand. An examination revealed some ecchymosis (discoloration of the skin) of the right hand and tenderness was noted at the fifth metacarpal at the fifth MCP joint without any malrotation or malalignment. He was also noted to have diminished grip strength. X-rays were negative for any acute fractures or dislocations. Dr. Sharma diagnosed the claimant with a right hand fifth MCP joint sprain and recommended conservative treatment and activity modification. The claimant was instructed to follow up after eight weeks of conservative treatment.

¶ 22 On August 8, 2015, the claimant presented to his primary care physician, Dr. Dennis Yap, and followed up on his right hand pain, numbness, and stiffness. Dr. Yap referred the claimant to Dr. Edward Trudeau, for electromyography (EMG) and nerve conduction velocity (NVC) tests.

¶ 23 On September 3, 2015, Dr. Trudeau performed the EMG and NCV tests. The claimant provided a history of cutting a log in April of 2015 when the log rolled back and impacted the top of his right hand, which had resulted in numbness in that area since then. He complained of weakness, discomfort, and pain in the dorsal surface of his right hand. The claimant noted on a questionnaire that his chief complaints of upper extremity pain and paresthesia (a tingling or numbness sensation) had been present for at least five months. The test results revealed right dorsal ulnar cutaneous neuropathy and bilateral carpal tunnel syndrome.

¶ 24    On October 14, 2015, the claimant presented to Dr. Christopher Wottowa for follow up of a crush injury of the hand. Dr. Wottowa noted complaints of pain in the claimant's right hand after he sustained an injury to his right hand in May of 2015, when a log rolled over the ulnar aspect of his hand. The claimant reported pain in his hand since that time. Dr. Wottowa noted that the claimant's pain was most localized to the MCP joints of the third, fourth, and fifth digits of the right hand, which radiated to the proximal interphalangeal (PIP) joints of the associated digits. The claimant also reported that the pain was over the dorsal and palmar aspect of his right hand and he experienced some numbness in these areas. Following an examination and review of the EMG and NCV tests performed by Dr. Trudeau, Dr. Wottowa assessed a crush injury to the third, fourth, and fifth metacarpals of the right hand related to the injury as described. Dr. Wottowa believed it would improve with time and instructed the claimant to follow up in two months. He recommended that the claimant soak his hand in paraffin baths a few times a day over the next few weeks.

¶ 25    On December 2, 2015, the claimant presented to Dr. Michael Neumeister, a plastic surgeon with certification in hand surgery, on the referral of Dr. Yap. The claimant identified the reason for this visit as "right hand three fingers" and reported pain and numbness. He noted that this began while he was at work and a log rolled over the dorsal aspect of his right hand and wrist. The claimant stated that he had numbness and tingling of the dorsal hand over the ulnar two digits. He also reported pain in the area with decreased grip strength on the side. The claimant noted prominent pain in his wrist while working and his pain had not improved. An examination revealed decreased sensation in the distribution of the dorsal branch of the ulnar nerve with numbness and tingling and a positive Tinel's sign overlying the area where the dorsal branch splits off. The claimant also demonstrated right ulnar sided wrist pain that could indicate a tear in the triangular fibrocartilage complex (TFCC). Dr. Neumeister noted decreased grip strength on the right hand

compared to the left and assessed an injury of the right wrist, hand, or finger and right hand pain. He ordered a magnetic resonance imaging (MRI) scan.

¶ 26    On January 6, 2016, the claimant returned to Dr. Neumeister for an evaluation of ongoing numbness and tingling in the right hand. Dr. Neumeister noted that the findings of the MRI showed a potential fracture through the base of the hamate (one of the eight bones in the wrist), which was likely old in nature; severe arthritis of the triscaphe joint potential for ulnar abutment syndrome with cystic changes in the proximal lunate and some degenerative changes with the TFCC; and a small cyst in the styloid process. He also noted that the claimant reported pain around the MCP joint that seemed to be getting worse and an episode of moderate swelling. An examination revealed some improved tenderness around the ulnar fovea, tenderness in the radial carpal joint that was a positive provocative compression at the cubital tunnel with numbness that developed in the dorsal and palmar side of the ulnar nerve distribution, and pain around the MCP joint that seemed to be within the joint itself. Dr. Neumeister opined that the claimant's most symptomatic problem was cubital tunnel syndrome[1] and likely arthritic changes to the MCP joint of the long finger on the right side. He noted some mild degenerative changes in the wrist in addition to bilateral carpal tunnel. The claimant indicated that he wanted relief for these symptoms, and Dr. Neumeister opined that he was a candidate for a right cubital tunnel release and a steroid injection into the right long finder MCP joint to stop the inflammatory degenerative process.

¶ 27    On February 9, 2016, Dr. Neumeister performed a right cubital tunnel release and injected

---

[1]      In Dr. Neumeister's evidence deposition, he described cubital tunnel syndrome as a condition that involves bands or scar tissue that are around the ulnar nerve. The ulnar nerve is most commonly associated with "the funny bone," where a person might hit the side of their elbow and receive electrical-like feelings that shoot down the hand, which indicates that the ulnar nerve had been hit. The ulnar nerve is very superficial right at the elbow and directly behind the bony prominence at the inner part of the elbow. Aside from carpal tunnel, it is the second most common nerve that gets trapped.

40mg of Kenalog into the long finger MCP joint. The claimant's postoperative diagnosis was right cubital tunnel syndrome and right long finger MCP arthritis. A week later, the claimant followed up with Dr. Neumeister, was doing well, and had a good return of sensation in his ulnar sided digits. His right long MCP joint seemed to have improved range of motion and less tenderness since the injection. Dr. Neumeister released the claimant on an as needed basis and stated he could return to work on February 29, 2016, without restrictions.

¶ 28 On April 21, 2016, the claimant presented to Dr. Daniel Phillips for a repeat EMG and NCV to evaluate his upper extremities. The claimant denied any right upper extremity symptoms. The impression was moderate bilateral sensory motor median neuropathies across the carpal tunnels, mild to moderate demyelinating ulnar neuropathy across the left elbow that was clinically asymptomatic, and mild demyelinating ulnar motor neuropathy across the left wrist that was reasonably related to the old fracture and step off that was clinically asymptomatic. When the right ulnar motor conduction velocity across the elbow was corrected for temperature, the results were unremarkable and had resolved. The claimant did not have symptoms in the median nerve distributions, and therefore, was found to not have carpal tunnel syndrome. Finally, Dr. Phillips noted that the claimant's dorsal ulnar cutaneous nerves were normal.

¶ 29 2. Section 12 Independent Medical Examination

¶ 30 On April 21, 2016, the claimant also underwent an independent medical examination (IME), per the City's request, pursuant to section 12 of the Act. The examination was performed by Dr. Mitchell Rotman, an orthopedic surgeon. The records indicate that the injury date was May 13, 2015, and the claimant was cutting a stump in half when half of the stump hit the ulnar aspect of his right hand, eventually resulting in an ulnar nerve release at the right elbow, which completely relieved his symptoms in his right hand. The claimant reported no complaints of numbness or

tingling unless he engaged in a long duration of overhead activities. He reported that he developed numbness over the dorsal ulnar aspect of his right hand at the time of the injury and that it went away completely after a few days following his ulnar release surgery. The claimant reported that the symptoms he had after the accident were not there before the accident and denied any prior trouble with the dorsal ulnar numbness and tingling.

¶ 31    Dr. Rotman reviewed the employee accident report, the MRI, and records from Springfield Clinic, Dr. Trudeau, Dr. Yap, and Dr. Neumeister. He opined that the claimant was doing very well from his nerve release on the right. He noted that the claimant's ulnar numbness and tingling went away quickly after his ulnar release on the right, suggesting that the numbness and tingling in that area may have been related to the elbow. However, he opined that there was no evidence of an elbow injury and a direct blow to the ulnar aspect of his wrist was not going to cause a significant torque to the elbow to have caused an acute cubital tunnel. Dr. Roman further noted that none of the providers had a single concern at the level of the elbow, but rather the dorsal ulnar hand and the dorsal ulnar cutaneous branch of the ulnar nerve. He opined that the claimant had reached maximum medical improvement (MMI) in relation to his wrist contusion and possible contusion of the dorsal sensory cutaneous branch of the ulnar nerve at the level of the right hand. Dr. Rotman further opined that the nerve release at the elbow and current tolerable symptoms from the left cubital tunnel would not be related to the accident.

¶ 32                              3. Evidence Depositions

¶ 33    Dr. Rotman testified that there was nothing in the claimant's history that suggested to him that the claimant sustained an injury to his right elbow. He saw no elbow injury in any history. Dr. Rotman opined that the main problems with Dr. Trudeau's EMG and NCV tests seemed to be the dorsal ulnar cutaneous branch of the ulnar nerve at the wrist, which appeared to be the source of

the claimant's numbness from the injury. He stated that Dr. Phillips did not find evidence of dorsal ulnar cutaneous neuropathy. Dr. Rotman opined that the claimant's carpal tunnel was not related to the injury and that the claimant would have had numbness in different fingers for carpal tunnel syndrome and wrist swelling.

¶ 34    On cross-examination, Dr. Rotman related the nerve injury of the dorsal ulnar cutaneous branch to the injury described. He opined that the claimant sustained a wrist contusion and possible contusion of the dorsal sensory cutaneous branch of the ulnar nerve at the level of the right hand. However, he further opined that the hamate fracture was not related to the injury and that it actually predated the injury. He stated the injection to the right middle finger of the MCP joint was not related to the occurrence of a direct blow on the opposite side of the hand. He opined that this problem was arthritic. Dr. Rotman noted that a torque that hits the dorsal ulnar aspect of the right hand would not torque the right elbow at all in the direction that an acute cubital tunnel would occur. He further noted that an acute cubital tunnel would occur if the claimant had a direct blow to the inner elbow, or an elbow fracture, or a torque in the opposite direction where the elbow was going into valgus or knock-kneed position of the elbow, which would stretch the ulnar nerve. Dr. Rotman also stated that, if the force of the tree coming down had thrown the claimant's elbow into the ground, that would be a direct blow to the inner elbow and cause an acute cubital tunnel, and it would be less likely for an acute cubital injury to occur if the claimant's hand was caught under the trunk briefly and he pulled with all of his might to get it out.

¶ 35    The claimant testified that, when he presented to Dr. Rotman, he told him that he twisted his right arm at the time of injury, but Dr. Rotman may not have heard him because his resident and nurses were talking while he was talking. The claimant also testified that Dr. Rotman never asked him whether he twisted his arm as part of his injury or if his elbow struck the ground.

¶ 36    Dr. Neumeister testified that the claimant complained of numbness and tingling in his right hand, particularly in the ring and little finger. He noted that the ulnar two digits are used for these two fingers. Dr. Neumeister stated that the claimant had symptoms on the dorsal of the back of his right hand, as well as decreased strength and pain at the dorsal wrist. He stated that Dr. Trudeau's noted changes to the dorsal cutaneous nerve on the back of the hand, which supplies sensation to the top of the ring and little fingers, and that nerve starts a few inches north of the wrist. On January 6, 2016, he noted on examination a provocative compression at the elbow that reproduced some of the symptoms the claimant had. Dr. Neumeister noted that it was significant that, after the surgery, the claimant's pain in his middle finger and numbness and tingling in his right little and ring finger had resolved.

¶ 37    Dr. Neumeister opined, if the numbness and tingling in the claimant's two digits and the ulnar side of his right wrist began immediately after the injury, that may cause him to believe that the incident caused or contributed to the claimant's right carpal tunnel syndrome. He noted that the wrist is a little bit of a distance away from the elbow and the injury may have been related to how he was having to hold his hand or wrist in a certain amount of elbow flexion or when the elbow was bent and potentially stretched the nerve. Dr. Neumeister further opined that the claimant had an injury to the nerve branch right at the wrist area, which resolved, but flared up at the elbow. He noted that, although the elbow was not directly traumatized, it may have been the result of the position he had to hold it in as a result of the injury or any swelling or inflammation that may have contributed to the compression.

¶ 38    Dr. Neumeister noted that, when the claimant completed the cutting through the trunk of a large tree with a chainsaw, and the trunk rolled over on the dorsal aspect of his right hand, twisting his hand and forearm until it pinned the back of his hand to the ground, this could be consistent

with an injury to the dorsal cutaneous branch of the right ulnar nerve. Also, if the force of the rolling trunk also forced the claimant's elbow to strike the ground while twisting outward, that could also have caused an injury to the right ulnar nerve. He added, if the claimant pulled his right arm from a twisted, pinned position with enough strength to free his hand under a 1000 pound log, that could also result in an injury to the right ulnar nerve. He reiterated that the claimant's symptoms of numbness and tingling appeared after the injury and stated that the incident could have caused or contributed to the claimant's ulnar neuropathy. On cross-examination, Dr. Neumeister opined that the claimant's symptoms of numbness and tingling did not resolve until after the cubital tunnel was released. He also stated, according to his notes, that the claimant did not mention his elbow on the December 2, 2015, office visit.

¶ 39                                    E. Arbitrator's Decision

¶ 40     The arbitrator found that the claimant proved, by a preponderance of the evidence, that he sustained an accidental injury to his right arm and hand that arose out of and in the course of his employment with the employer on March 24, 2015. The arbitrator found the following supported her decision: (1) the claimant's testimony was consistent with the credible medical records; (2) O'Neal's testimony supported a finding that the claimant reported an injury to him within weeks of the alleged injury and may have also told O'Neal of his symptoms at that time; (3) O'Neal had no reason to believe the claimant's alleged injury did not happen as he described; (4) the incorrect accident date was based on the claimant's failure to report the accident for a few weeks; (5) O'Neal did not realize at first that the claimant's first trip to a prompt care clinic was for a work injury; (6) O'Neal did not complete paperwork until October 19, 2015, and the accident date was identified as the first day the claimant sought treatment rather than the day he was actually hurt; (7) no investigation into the accident occurred; and (8) Haynes testified that he had spoken with

Long, and Long stated that the claimant mentioned to him that he had gotten hurt.

¶ 41    As to whether the claimant provided the City with timely notice of the accident, the arbitrator noted that the claimant stated he provided notice to both O'Neal and Haynes. The arbitrator found it significant that O'Neal testified that he had a conversation with the claimant in April of 2015 about going to a prompt care clinic and that the claimant may have told him about his symptoms at that time. Although O'Neal testified that he did not know the claimant had a work injury, he agreed there would be no reason for the claimant to report the injury to him and inform him that he was going to seek medical treatment at the prompt care clinic, which is where the City has its employees checked out following an injury. O'Neal also stated that there would be no reason for an employee to report an injury to him and inform him of their intention of seeking treatment at the prompt care clinic unless it was a work-related injury.

¶ 42    Next, the arbitrator found that the claimant's condition of ill-being was causally related to the injury. She found that both Drs. Rotman and Neumeister opined that, if the force of the tree coming down had thrown the claimant's elbow into the ground, that would be a direct blow to the inner elbow that could cause an acute cubital tunnel. The claimant provided unrebutted testimony that is what happened to his hand and arm. Additionally, the claimant had no problems with his right hand or elbow prior to the injury on March 24, 2015, his symptoms were persistent until he underwent the right cubital tunnel release and received an injection into the right long finger MCP joint, and his symptoms resolved after his right cubital tunnel release and injection.

¶ 43    The arbitrator also found that the treatment the claimant received for his right hand and arm from March 24, 2015, through February 18, 2016, was reasonable or necessary to cure or relieve the claimant from the effects of the injury he sustained on March 24, 2015. Thus, the City was ordered to pay for such treatment and reimburse the claimant for any related out-of-pocket

expenses the claimant incurred between March 24, 2015, and February 18, 2016. The arbitrator also awarded the claimant TTD for 2-6/7 weeks for the time he was off work for his surgery and permanent partial disability (PPD) to the extent of 15% loss of use of his right arm.

¶ 44                                    F. The Commission's Decision

¶ 45    On January 28, 2019, the Commission affirmed and adopted the arbitrator's decision. One commissioner dissented, stating that she would have found that the claimant did not sustain his burden of proving that a work-related accident caused his current condition of ill-being and denied compensation because (1) the claimant's testimony was inconsistent with the mechanism of injury and medical records and (2) Dr. Rotman was more persuasive than Dr. Neumeister.

¶ 46                                    G. The Circuit Court's Decision

¶ 47    The City sought review before the circuit court of Sangamon County. On October 21, 2019, the court confirmed the Commission's decision. The City appeals.

¶ 48                                    III. ANALYSIS

¶ 49    The City argues that three of the Commission's findings were against the manifest weight of the evidence: that the claimant (1) provided the City with notice of the alleged accident, (2) sustained an accidental injury on March 24, 2015, and (3) suffered an injury to his right elbow at the time of the accident. The claimant argues that the Commission's decisions were proper.

¶ 50    These issues involve questions of fact; therefore, the manifest-weight standard applies. *Gano Electric Contracting v. Industrial Comm'n*, 260 Ill. App. 3d 92, 95 (1994). A finding is against the manifest weight of the evidence when the opposite conclusion is clearly apparent. *Shafer v. Illinois Workers' Compensation Comm'n*, 2011 IL App (4th) 100505WC, ¶ 38. Moreover, it is primarily for the Commission to resolve conflicts in the record, evaluate the credibility of witnesses, and draw inferences from and assign weight to the evidence. *Hosteny v.*

- 15 -

*Illinois Workers' Compensation Comm'n*, 397 Ill. App. 3d 665, 678-79 (2009). As such, whether a reviewing court might reach the same conclusion is irrelevant, and we must determine whether there is sufficient evidence in the record to support the Commission's decision. *Benson v. Industrial Comm'n*, 91 Ill. 2d 445, 450 (1982). It was the claimant's burden to prove all elements of his claim by a preponderance of the evidence before the Commission. *Hosteny*, 397 Ill. App. 3d at 674. On appeal, it is now the City's burden, as the appellant, to demonstrate error warranting reversal. *TSP-Hope, Inc. v. Home Innovators of Illinois, LLC*, 382 Ill. App. 3d 1171, 1173 (2008). With these standards in mind, we turn to the issues that control this appeal.

¶ 51    We first address the issue of notice. Pursuant to section 6(c) of the Act, a claimant is required to give notice to his or her employer within 45 days of a work-related accident. 820 ILCS 305/6(c) (West 2014). "The purpose of the notice requirement is both to protect the employer against fraudulent claims by giving him an opportunity to investigate promptly and ascertain the facts of the alleged accident and to allow him to minimize his liability by affording the injured employee immediate medical treatment." (Internal quotation marks omitted.) *Tolbert v. Illinois Workers' Compensation Comm'n*, 2014 IL App (4th) 130523WC, ¶ 67. The notice requirement is jurisdictional, rendering the failure of the claimant to provide notice a bar to his claim. *Id.*

¶ 52    Here, the City argues that the claimant's notice of the alleged accident was beyond the 45 days required by the Act. Specifically, the City argues that the claimant told O'Neil on May 13, 2015, that he was going to seek treatment at the prompt care clinic that day. Therefore, the notice was given 50 days after the accident date of March 24, 2015.

¶ 53    This contention misconstrues the record. Regarding the claimant's trip to the prompt care clinic on May 13, 2015, the claimant testified: "I'm going to say *three weeks before* I told [O'Neil] that I was going to seek – I was going to go to Prompt Care and get it looked at." (Emphasis added.)

Neither the claimant nor O'Neil testified that the claimant stated that was seeking treatment on the day of this conversation as the City suggests. O'Neil stated that this conversation took place "in April or early May, but *** probably sometime [at] the end of April or - yeah, sometime in the middle of April, end of April." He later said that it "[c]ould have been May of 2015." It is clear that O'Neil did not recall when the conversation took place or the conversation itself. However, it is undisputed that such conversation occurred. O'Neil did not directly rebut that the conversation occurred in April of 2015—only that it could have occurred in April or May of 2015.

¶ 54     The claimant notified the City's *safety technician* of his planned trip to the very prompt care clinic where the City sends its employees for injuries, and O'Neil admitted there would be no reason for the claimant to tell him this information if it did not stem from a work-related accident. It is evident that the Commission found the claimant's testimony that he notified O'Neil of the accident in April of 2015 credible, which would have been within 45 days of the March 24, 2015, accident. This is unsurprising as O'Neil's testimony as a whole contains a number of uncertainties. Therefore, there is sufficient evidence of record to support the Commission's finding that the claimant provided the City of notice of his work-related accident within 45 days, and the Commission's decision is not against the manifest weight of the evidence.

¶ 55     Next, the City argues that the Commission's finding that an accident occurred was not based on credible evidence. Alternatively, the City argues that the claimant failed to prove that he suffered an injury to his right elbow at the time of the accident. To obtain compensation under the Act, a claimant must show, by a preponderance of the evidence, that he suffered an injury that arose out of and in the course of his employment. *Baggett v. Industrial Comm'n*, 201 Ill. 2d 187, 194 (2002). A specific trauma theory, as the one presented here, requires the claimant to establish that his injuries are traceable to a definite time, place, and cause occurring within the course of

employment. *International Harvester v. Industrial Comm'n*, 56 Ill. 2d 84, 88-89 (1973).

¶ 56     It is apparent that the claimant relied on the incident where he was instructed to cut a tree trunk in half on March 24, 2015. However, the City argues that the claimant's testimony was not credible and does not support the Commission's finding that an accident occurred. Among other things, the City takes issue with: (1) the claimant's testimony where he stated he twisted his arm trying to pull the chainsaw out but no medical records mention twisting; (2) the claimant testified that he told Haynes the day he was injured, which Haynes denied; (3) the claimant testified that he felt numbness and tingling when the log rolled onto his hand yet when he first sought medical attention with Dr. Sharma on May 13, 2015, medical records showed that he complained of pain and discomfort in his hand without mention of any numbness; (4) medical records show that the claimant told medical providers that the accident occurred in either April or May of 2015; (5) the claimant's paperwork with the City indicated an accident date of May 13, 2015, and was not amended to list an accident date of March 24, 2015, for two years; (6) it was unclear when Haynes talked to Long when Long stated that he knew the claimant was injured; and (7) O'Neal testified that no written report was filled out until October 19, 2015, yet the claimant asserted he filled out paperwork with O'Neil following his prompt care visit in May of 2015.

¶ 57     As explained, the Commission is tasked with resolving conflicts in the record, evaluating the credibility of witnesses, and drawing inferences from and assigning weight to the evidence. *Hosteny*, 397 Ill. App. 3d at 678-79. Here, the Commission resolved the evidence in favor of the claimant, and our review of the record demonstrates there was ample evidence to support the Commission's decision that an accidental work-related injury occurred on March 24, 2015. The medical records that note the source of the claimant's injury consistently refer to the incident the claimant described when cutting the tree trunk in half. The claimant's account of the accident was

never rebutted and medical records and evidence supported his description of events. The claimant had no complaints of his right hand or arm prior to the accident, the injury was documented, and the injury was resolved with surgery. The work order for the removal of the oak tree was also entered into evidence. Additionally, O'Neal, the City's safety technician, stated that he had no reason to believe that the accident did not occur as the claimant reported. Therefore, we cannot say that an opposite conclusion of the Commission is clearly apparent.

¶ 58 Last, we address the City's argument that that the claimant failed to prove that he suffered an injury to his right elbow at the time of the accident. The City contends that the claimant's medical records do not mention the claimant's right elbow and essentially argues that Dr. Rotman's opinion was more credible than Dr. Neumeister's opinion as to whether the claimant's right elbow was involved in the accident.

¶ 59 Dr. Rotman testified that the claimant did not sustain an elbow injury. Thus, he opined that Dr. Neumeister's cubital tunnel release surgery was unrelated to the accident on March 24, 2015. However, Dr. Rotman stated that cubital tunnel presents with numbness and tingling in the ring and small fingers, which was included in the claimant's complaints. He also stated that the force of the trunk could throw the inner aspect of the elbow to the ground and acutely bash against the ulnar nerve at the elbow and cause cubital tunnel. The claimant testified that when he saw the trunk was moving toward him, his arm hit the ground, which would include his elbow. Dr. Neumeister opined that the event of the trunk moving toward the claimant, as the claimant described, was causally related to the surgery. He noted that, if the symptoms began with the injury and resolved with the surgery, they were likely related. Although the claimant never specifically complained of an elbow injury to his providers, Dr. Neumeister's deposition testimony provided that the ulnar nerve ran through the elbow to the hand where the claimant reported symptoms.

¶ 60    The Commission is tasked with resolving conflicts in the medical testimony and evidence. See *Prairie Farms Dairy v. Industrial Comm'n*, 279 Ill. App. 3d 546, 551 (1996). Accordingly, it was for the Commission to decide which of two conflicting opinions should be accepted, and we will not substitute our judgment for that of the Commission. *Setzekorn v. Industrial Comm'n*, 353 Ill. App. 3d 1049, 1055 (2004). We find sufficient evidence of record to support the Commission's decision that the claimant's cubital tunnel syndrome was causally related to the accident.

¶ 61                                    IV. CONCLUSION

¶ 62    For the foregoing reasons, we affirm the judgment of the circuit court of Sangamon County, which confirmed the Commission's decision.

¶ 63    Affirmed.