2021 IL App (5th) 200346WC-U
No. 5-20-0346WC
Order filed: December 6, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION

| | | |
|---|---|---|
| RICKY A. DUNCAN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Appellee, | ) | St. Clair County |
| | ) | No. 19MR199 |
| v. | ) | |
| | ) | |
| THE ILLINOIS WORKERS' | ) | Honorable |
| COMPENSATION COMMISSION *et al.* | ) | Julie K. Katz, |
| (Ameren Illinois, Appellant). | ) | Judge, Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Holdridge and Justices Hoffman, Hudson, and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*:    By finding that the employee had failed to carry his burden of proving irritant-induced asthma or a permanent exacerbation of asthma from his exposures to fumes in the workplace, the Illinois Workers' Compensation Commission (Commission) did not make a finding that was against the manifest weight of the evidence.

¶ 2    The petitioner, Ricky A. Duncan, sought workers' compensation benefits from the respondent, Ameren Illinois (Ameren), for an alleged permanent and irreversible condition of irritant-induced bronchial reactivity. Duncan claimed that he contracted this condition by inhaling fumes on September 4, 2013, and October 8, 2014, while he was on duty as a gas journeyman.

Arbitrator Edward Lee found that although the two exposures had temporarily exacerbated Duncan's preexisting asthma, Duncan had failed to prove any permanent ill effects from the two exposures. (Ameren had paid for medical treatment and other workers' compensation benefits for what the arbitrator found to be these temporary exacerbations.) As the arbitrator stated, Duncan had "fail[ed] to meet his burden of proof as to any indication of permanent aggravation or permanent partial disability relating thereto in terms of the underlying asthma—rather, that any perceived progression of symptoms would be compatible with his ten plus year history of symptoms compatible with asthma." Thus, the arbitrator denied Duncan's claim for permanent total disability benefits, additional temporary total disability benefits, and additional medical benefits. The Commission adopted the arbitrator's decision.

¶ 3        Duncan appealed to the St. Clair County circuit court, which reversed the Commission's decision, finding it to be against the manifest weight of the evidence. Ameren now appeals to us. We are unconvinced that a conclusion opposite to that which the Commission reached is clearly demanded by the evidence. Therefore, we reverse the circuit court's judgment, and we reinstate the Commission's decision.

¶ 4                                    I. BACKGROUND

¶ 5        Duncan worked for Ameren as a gas journeyman "lead man." His job was to repair and replace natural gas lines. It was heavy outdoor work in which he frequently was exposed to heat, cold, fumes, gases, and solvents.

¶ 6        On September 4, 2013, Duncan and a coworker, Al Hoernis, went to a job site to check on a gas line because Ameren wanted to install a utility pole nearby. He and Hoernis dug a ditch, and about three feet down they found a four-inch cast-iron line, which was marked as a gas line. Their task was to determine whether the line was alive or dead, that is, whether it still had

any gas in it. To do so, they had to rupture the line and see if anything came out. Duncan went down into the ditch and sawed into the cast iron with a hacksaw. What looked like water spouted out, causing him and Hoernis to wonder if, instead of a gas line, it was a water line. The liquid running out of the line turned red and foamy as it collected in the bottom of the ditch. From his experience as a gas journeyman, Duncan knew that gas lines, especially old ones, customarily were cleaned with benzine.

¶ 7        Duncan went to the truck and radioed one of his supervisors, reporting what he and Hoernis had found. Duncan also told his supervisor that he "had a very tight chest," was having difficulty breathing, and had a rusty taste in his mouth. He had been exposed to the liquid in the ditch for about 20 minutes. Hoernis, who had gone down into the ditch and collected a sample of the liquid, also had a rusty taste in his mouth. A supervisor came to the job site. Duncan described his symptoms to the supervisor and the supervisor took Duncan to the hospital.

¶ 8        Duncan arrived at St. Elizabeth's Hospital in Belleville, Illinois, at 11:38 a.m. on September 4, 2013. He reported to medical personnel that after inhaling an unknown toxic gas, he began coughing and having chest pain and shortness of breath. According to the emergency room report, Duncan stated that he had "worked in the gas utility field for 20+ years." A pulse oximetry test revealed that his oxygen saturation levels were between 97% and 100%, a normal reading. Nevertheless, the partial pressure of oxygen in his arterial blood gas was 71 millimeters of mercury (mm Hg), which was low, the normal range being 75 to 100 mm Hg. This result of 71 mm Hg was in line, however, with a result of 68 mm Hg obtained 14 years earlier, on July 28, 1999, when Duncan went to a pulmonologist, Dr. David S. West, because of "shortness of breath upon exertion."

¶ 9          At the time of this visit to the emergency room of St. Elizabeth's Hospital on September 4, 2013, Duncan's breath sounds were clear in both the right and left lungs, and his respiratory pattern was regular, although he complained of dyspnea (shortness of breath) on exertion. He was diagnosed with a "respiratory problem" as the primary impression and bronchitis and chemical exposure as additional impressions. At 4:56 p.m. on September 4, 2013, when Duncan was discharged from the hospital, his condition was "improved and stable." Dr. Hayden Smith prescribed albuterol, methylprednisolone, and azithromycin; told him to follow up with his personal physician in three days; and released him to light duty.

¶ 10         Duncan testified that for two days after the initial exposure, he was taken off work but that he then returned to field work as a gas journeyman and continued full-time employment for nine months, until May 12, 2014. He testified, however, that his supervisor accommodated him by not assigning him to gas leaks. Whenever a gas leak had to be repaired, Duncan waited in the truck.

¶ 11         On September 9, 2013, as Dr. Smith had directed, Duncan followed up with Dr. Adele Roth of Illini Family Medicine, who had been his primary physician since 1999. He complained to her of having, for the past five days, a persistent cough. In her physical examination of Duncan, Dr. Roth found that he had a "normal respiratory rate and pattern with no distress" but that he had "diffuse inspiratory wheezes" and "diffuse expiratory wheezes" ("diffuse" in the sense that the airway obstruction did not sound localized). She diagnosed "acute bronchitis" and told him to continue using an albuterol inhaler, which she first prescribed for him in 2002.

¶ 12         On September 19, 2013, Duncan returned to Dr. Roth. He still complained of a cough. In addition, he complained of congestion and tightness in his chest and of pain and

pressure in his sinuses. Dr. Roth wrote, "His primary symptoms include cough, ear complaints, facial pressure, fever, headache, nasal congestion, and rhinorrhea" (a runny nose). She noted that Duncan had a history of "allergies and frequent sinusitis." The respiratory examination that day revealed a "normal respiratory rate and pattern with no distress" and "normal breath sounds with no rales, rhonchi, wheezes[,] or rubs." Dr. Roth diagnosed acute sinusitis and instructed Duncan to "continue [his] inhaler on a regular basis." Also, she referred him to a pulmonologist, Dr. Peter Tuteur, at Washington University in St. Louis.

¶ 13 Duncan first saw Dr. Tuteur on November 6, 2013. He recounted to Dr. Tuteur that after inhaling the fumes from the reddish foam in the ditch, he experienced a tightness in his chest, breathlessness, coughing, and a " 'rusty sewer fluid' " taste in his mouth, to quote from the report that Dr. Tuteur wrote that day. Duncan's "only coworker," Dr. Tuteur continued, "also experienced the taste but felt that he did not wish to seek additional medical attention and after several days no longer had anything but transient respiratory symptoms." Duncan, however, had sought treatment in the emergency room of St. Elizabeth's Hospital. He told Dr. Tuteur that, ever since the exposure in the ditch, he "felt severely impaired." To quote further from Dr. Tuteur's report:

> "In contrast to his former ability to shovel continually to develop a 3 x 3 x 3 foot hole in less than an hour he had to stop shoveling after 5 minutes. His 'buddies helped.' Currently he has reached a plateau where he is able to shovel for 10 sometimes 15 minutes. With this exercise chest tightness pressure, and soreness would develop as well as breathlessness and increasing cough ***.
>
> Currently though breathless with minimal exercise at baseline, symptoms worsen in response to a wide variety of triggers including increasing exercise,

cold air, smells like products of fossil fuel combustion or natural, barbecue smoke, cleaning solutions, and other irritants. When this develops, he takes albuterol meter dose inhalers which produces some partial relief within a half hour, but takes more than an hour and a half to return to baseline."

¶ 14 "Of import," Dr. Tuteur remarked, is that Duncan "had no chronic childhood illnesses such as *** asthma," and "there is no personal *** history of allergies or asthma." Dr. Tuteur understood at the time of his report that Duncan was "without a[ ] prior pulmonary history or symptomatology." Being hitherto free of any breathing difficulties, Duncan was exposed to a liquid that, according to subsequent chemical analysis, "included excessive concentrations of lead, benzine, ethyl benzine, to[yu]lene, and methyl mercaptan." This exposure "result[ed] in severe limitation of exercise," and Duncan's condition was "still exacerbated when [he was] exposed to triggers."

¶ 15 Laboratory data, Dr. Tuteur noted, tended to corroborate Duncan's complaints of respiratory limitation. A pulmonary function study dated November 6, 2013, revealed a "minimal obstructive abnormality manifested by reduced flow at low lung volumes." Duncan had a reduced forced expiratory volume at one second (FEV1) and also a reduced forced vital capacity (FVC), which was the amount of air that he could forcefully and quickly exhale after taking a deep breath. In addition, "[a] methacholine challenge test [was] positive for the presence of bronchial reactivity."

¶ 16 Dr. Tuteur concluded in his report, "This clinical picture is quintessentially consistent with the diagnosis of irritant induced bronchial reactivity." He regarded "[t]his underlying clinical state" as "objectively confirmed by the positive methacholine challenge test."

¶ 17 On November 14, 2013, Duncan returned to Dr. Roth. He told Dr. Roth that he

had a "recent cough and dyspnea." A respiratory examination again revealed (to quote from Dr. Roth's report) a "normal respiratory rate and pattern with no distress" and "normal breath sounds with no rales, rhonchi, wheezes[,] or rubs." Dr. Roth diagnosed "reactive airway disease." She noted, "[Duncan] has asthma which was first diagnosed in adulthood. The current exacerbation began 6 weeks ago."

¶ 18    On May 1, 2014, Duncan went to Dr. Roth's office for an annual examination. Duncan complained that he was still short of breath. A respiratory examination revealed, again, as Dr. Roth put it in her report, a "normal respiratory rate and pattern with no distress" but "coarse breath sounds throughout."

¶ 19    On May 9, 2014, Duncan returned to Dr. Tuteur for further evaluation and continued care. Duncan told Dr. Tuteur that, since his last visit, he had attempted to continue working but that he had "encountered serious pulmonary problems," to quote from Dr. Tuteur's report of that date. Specifically, Dr. Tuteur noted the following description of symptoms he had received from Duncan:

> "Recurrent triggers are found in the environment of the parking lot as he enters the workplace secondary to vehicular exhaust. Furthermore as he travels through the mechanic shop as well as other areas where natural gas odor is present. Chest tightness, shortness of breath and discomfort develop[ ]. Seeking relief in the offices produced response to different triggers such as toner, magic marker and perfumes and colognes worn by personnel. Job site triggers also exist and most prominently cold ambient air. The environment in which he has the least amount of symptoms is of course his home. Even going into restaurants or commercial venues from time to time exposures initiate an exacerbation sufficient

to cause severe symptoms, require rescue inhaler and a delayed response develops."

¶ 20    Dr. Tuteur reviewed a pulmonary function study dated May 9, 2014, which, he noted, revealed "a moderate obstructive ventilatory defect at baseline conducted 5 hours after Advair and albuterol that improves significantly and substantially (32%) following the administration of 3 puffs of albuterol." To Dr. Tuteur, "[t]his demonstrate[d] marked reversibility (bronchial reactivity)." He further concluded, "[C]ompared to previous studies[,] the baseline values reflect a more severe obstruction leading to concern for the initiation of bronchial remodeling," or scarring of the bronchial passages.

¶ 21    Dr. Tuteur diagnosed "severe irritant induced workplace associated bronchial reactivity," a "permanent and irreversible" condition. He advised:

> "It is medically indicated for [Duncan] to maintain environmental control in the home through the use of [high efficiency particulate air] filters placed in rooms where he spends most of his time, and eliminate known triggers such as cooking fumes, cleaning solutions, perfumes, colognes, hairspray, ambient tobacco smoke, etc. It is medically contraindicated for him to return to the workplace."

¶ 22    From May 12, 2014, to September 21, 2014, in accordance with Dr. Tuteur's recommendation, Duncan was off work on disability.

¶ 23    On August 30, 2014, while Duncan was on disability leave from Ameren, private investigators hired by Ameren videotaped him attending an outdoor barbecue at the Elks Lodge in Fairview Heights, Illinois. Duncan stood next to a smoking grill, wrapped hotdogs and hamburgers, and placed them on trays. The barbecue smoke did not appear to cause him any respiratory distress. He unloaded children's bicycles from a pickup truck and jumped down from

the bed of the truck. He walked around on the grounds. He stood in a group of people, one of whom was smoking cigarettes. The tobacco smoke did not appear to bother Duncan. On August 31, 2014, at the Elks Lodge, he was videotaped moving picnic tables.

¶ 24        In the arbitration hearing, Duncan explained that on August 30, 2014, at the Elks Lodge, the wind was blowing hard and he was upwind of the barbecue smoke and cigarette smoke.

¶ 25        On September 9, 2014, pursuant to section 12 of the Workers' Compensation Act (820 ILCS 305/12 (West 2014)), Duncan submitted to an independent examination by Dr. Thomas M. Hyers, a pulmonologist at C.A.R.E. Clinical Research in St. Louis, Missouri. Dr. Hyers found Duncan's respiration to be, as Dr. Hyers wrote in his report, "unlabored," with a respiratory rate of 19 at rest. Duncan was "able to speak easily in complete sentences without stopping for a breath." Dr. Hyers repeatedly attempted a spirometry only to obtain "uninterpretable" results: "non-reproducible expiratory curves after multiple attempts." He concluded as follows:

> "Mr. Duncan has asthma clearly documented in the medical record prior to the workplace exposure in September of 2013. Therefore, [Dr. Tuteur's] diagnosis of irritant-induced asthma is incorrect, i.e., the workplace exposure did not cause his asthma. Any exacerbation of his asthma symptoms by the workplace exposure had resolved by the time of his follow-up visit with Illini Family Medicine on 09-19-2013 when his chest exam was normal. He has incurred no permanent partial disability as a result of his workplace exposure. His work capability returned on 09-19-2013 to his work capability prior to the exposure incident. He will require ongoing medical care and medication for his pre-existing asthma, which is not a

work-related condition."

¶ 26    On September 22, 2014, Duncan returned to work full-time as a gas journeyman at Ameren.

¶ 27    The second work-related exposure was on October 8, 2014. Duncan was sitting in a crew room at Ameren. A valve on a pipe was being repaired, and Duncan smelled mercaptan, the odorant added to natural gas. At the same time, in an adjacent storeroom, propane-fueled forklifts were being used. Duncan testified that there were "extremely high levels of fumes in there" without any ventilation. According to this testimony, his chest tightened. He could hardly breathe and his vocal cords were swelling shut. He went outside to try to escape the fumes, but diesel trucks were lined up outside idling, as crews were getting ready to go out on jobs. He went back inside the building and, leaning against a wall, retreated into the lunchroom. Someone noticed his labored breathing and called an ambulance, which took him to St. Elizabeth's Hospital.

¶ 28    Dr. Pankaj Kaul examined Duncan in the hospital. A report that he signed on October 8, 2014, reads as follows under "PHYSICAL EXAMINATION": "When I saw the patient, he looks pretty comfortable in no distress. Family at the bedside. Respirations are nonlabored. Good air entry bilaterally. No rales, rhonchi, or wheezing could be appreciated." Even though Dr. Kaul observed no objective symptoms of respiratory distress or discomfort, he decided to keep Duncan in the hospital overnight.

¶ 29    Duncan was discharged from St. Elizabeth's Hospital the next day, on October 9, 2014. The discharge summary, signed by Dr. Kaul, noted the following under "HOSPITAL COURSE": "Patient admitted with shortness of breath, chest tightness, started yesterday after being exposed to fumes at work. *** Overnight his symptoms actually did better and he did not

have any further more [*sic*] complaints." Dr. Kaul continued, under "PHYSICAL EXAMINATION," "When I saw him, he looks pretty comfortable in no distress. Respirations are nonlabored. Good air entry bilaterally. No rales, rhonchi, or wheezing appreciated."

¶ 30    When Dr. Tuteur examined Duncan on October 17, 2014, he found his oxygen saturation to be "96% sitting while breathing room air," to quote from Dr. Tuteur's report. Examination of the chest revealed "full, equal, and synchronous expansion." Breath sounds were normal.

¶ 31    On March 30, 2015, Dr. Anne-Marie M. Puricelli performed an independent medical examination of Duncan in connection with a claim by him for disability insurance benefits. In her report of that date to Lauren N. Barginear, Ameren's senior employee benefits clerk, Dr. Puricelli recounted what history she had been able to obtain from Duncan. (Dr. Puricelli remarked in her report that he "was not very interested in giving a full history.") He told Dr. Puricelli that "his bouts of asthma started in September 2013," when some chemicals spilled out of a gas line and on October 8, 2014, while in the workplace, he was exposed a second time to fumes. He "denie[d] any prior history of asthma." After summarizing the records from Dr. Tuteur's office, including the pulmonary function report of October 17, 2014, Dr. Puricelli noted what she had found in her physical examination of Duncan. He appeared to be "in no acute distress." His pulse oximeter was 94%. She noted the following from her examination of his lungs: "Initial scant wheeze in the right anterior lung field. Otherwise, he has good air movement throughout. No other wheezing and normal inspiratory and expiratory phases. He coughed for much of the examination." She diagnosed "[h]istory of reactive airway dysfunction syndrome or reactive airway disease." She opined that, at the time, he was "not capable of performing his normal duties as Gas Journeyman Leadman."

¶ 32	On April 18, 2017, at Ameren's request, Dr. Puricelli examined Duncan a second time. In her report of that date to Kelly A. Powell-Rogers, Ameren's retirement and insurance clerk, Dr. Puricelli noted the following about Duncan's lungs: "Initially, there was some fine rhonchi in the bases that cleared with coughing. He was[,] otherwise, clear with good air movement, no wheezes." Initially, with two liters per minute of oxygen flowing into his nostrils, Duncan's oxygen saturation level was 96%. After he was off oxygen for five minutes, his oxygen saturation level dropped to 91%. Dr. Puricelli's diagnosis was "[h]istory of reactive airways disease." In her opinion, "after examining *** Duncan and reviewing the available records," he was "currently disabled for all occupations."

¶ 33	II. ANALYSIS

¶ 34	The burden was on Duncan, Ameren observes, to prove that his 20-minute exposure to mercury, benzene, and mercaptan on September 4, 2013, and his exposure to mercaptan and diesel fumes on October 8, 2014, caused his permanent pulmonary condition. See *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 203 (2003); *Hosteny v. Illinois Workers' Compensation Comm'n*, 397 Ill. App. 3d 665, 674 (2009). The Commission adopted Arbitrator Lee's recommended decision that Duncan had proved only temporary aggravations of preexisting asthma, not a permanent aggravation of the condition or a permanent partial disability. The Commission agreed with the arbitrator that the progression of symptoms described by Duncan was compatible with the more than 10 years of pulmonary symptoms documented in his medical records.

¶ 35	In arriving at that conclusion, the Commission relied on Dr. Hyers's medical expertise. Dr. Hyers was a board-certified physician in internal medicine and pulmonary medicine. He opined that Duncan had preexisting asthma and that the two workplace incidents triggered

asthma attacks without significantly changing Duncan's preexisting asthma. One incident was in 2013, and the other was in 2014. In Dr. Hyers's view, those two asthma attacks were consistent with (1) the asthma attacks that Duncan had been having once a year, on average, from 2009 to 2013 and (2) the dyspnea and bronchospasms that he had been experiencing for more than a decade. Ameren maintains that this medical opinion by Dr. Hyers is not inherently incredible and that the Commission had a right to believe Dr. Hyers over Dr. Tuteur.

¶ 36        It is for the Commission to "assess the credibility of witnesses, resolve conflicts in the evidence, assign weight to be accorded the evidence, and draw reasonable inferences from the evidence." *Hosteny*, 397 Ill. App. 3d at 678-79. We are limited to deciding whether the Commission's resolution of those factual questions is against the manifest weight of the evidence—which is to say, we are limited to deciding whether the evidence *clearly* calls for the opposite conclusion. See *id.* at 674-75.

¶ 37        In Duncan's view, the Commission clearly erred in many of its factual findings. He argues that weighing the credibility of Dr. Hyers against the credibility of Dr. Tuteur required an accurate understanding of all the evidence, including, of course, Dr. Tuteur's testimony. Duncan claims that Arbitrator Lee's decision (which the Commission adopted) is pervaded by errors of fact that skewed the Commission's assessment of credibility, not only Dr. Tuteur's credibility but Duncan's own credibility. Duncan expresses most of his claims of factual error as bullet points, some of which are rather enigmatic in their brevity, but he seems to argue, essentially, that the Commission's decision is factually mistaken in six ways.

¶ 38        First, Arbitrator Lee wrote that "Dr. Tuteur did not have all records from Dr. Roth/Illini Family Medicine." Duncan criticizes that statement as being factually erroneous. He

observes that on January 26, 2015, in his deposition, Dr. Tuteur testified that he had reviewed the records from Dr. Roth's office.

¶ 39    That observation is correct—Dr. Tuteur did so testify in his deposition—but maybe what the Commission had in mind was the report that Dr. Tuteur issued more than a year before his deposition. On November 6, 2013, after examining Duncan, Dr. Tuteur wrote that Duncan's "clinical picture" was "quintessentially consistent with the diagnosis of irritant induced bronchial reactivity." This was the same opinion that Dr. Tuteur expressed later in his deposition on January 26, 2015. Unlike his deposition, though, Dr. Tuteur's report failed to acknowledge any previous pulmonary symptoms. In fact, in his report, Dr. Tuteur affirmatively represented that, before the occupational exposure in September 2013, Duncan never had any lung-related symptoms. As Dr. Tuteur put it in his report, Duncan was "without a[ ] prior pulmonary history of symptomatology." It would be reasonable to suppose that before Dr. Tuteur made that representation in his report, he asked his patient, Duncan, if he previously had any breathing problems and that Duncan answered—falsely—no. Even so, one might have expected that Dr. Tuteur would have wanted to see Duncan's medical records before venturing an opinion on causality.

¶ 40    Duncan's medical records for the period of May 1999 to August 2013 reveal that on 15 or 16 separate occasions he complained of pulmonary symptoms, including shortness of breath, coughing, tightness in his chest, and wheezing, and that he used an albuterol inhaler. Most of those pulmonary references were in Dr. Roth's records—leading to a defensible inference that before Dr. Tuteur wrote his report on November 6, 2013, he did not review Dr. Roth's records.

¶ 41    Afterward, to enable Dr. Tuteur to prepare for his deposition, Duncan's attorney

provided Dr. Tuteur a copy of Dr. Roth's records. In a letter dated December 10, 2014, Duncan's attorney notified Dr. Tuteur of his deposition scheduled for January 26, 2015, and enclosed medical records, including the records from Dr. Roth's office. This letter from Duncan's attorney to Dr. Tuteur could support an inference that Dr. Tuteur previously lacked Dr. Roth's records (or else there would have been no need for Duncan's attorney to send the records to him), and before arriving at the causation opinion he offered earlier in his report, Dr. Tuteur had not reviewed those records.

¶ 42     Granted, an argument might be made that this initial omission was unimportant since (1) Dr. Tuteur reviewed Dr. Roth's records before testifying in his deposition and (2) in his deposition, Dr. Tuteur reaffirmed the causation opinion that he set forth earlier in his report. Not all reasonable triers of fact, however, would necessarily find that argument to be fully satisfying. Medical records that over a 14-year period made repeated references to wheezing and asthma surely were worth considering before offering an opinion *in the first place* on a causal connection between the occupational exposures and the asthma. Dr. Roth was, after all, Duncan's primary care physician, and her documentation of asthmatic symptoms surely was relevant—as Duncan's attorney could be understood to have admitted by sending the documentation to Dr. Tuteur in preparation for his deposition. Dr. Hyers, apparently, reviewed the medical records before forming *his* opinion: his report mentioned the "asthma clearly documented in the medical record prior to the workplace exposure in September 2013." For that reason, it would be reasonably defensible for a trier of fact to believe Dr. Hyers over Dr. Tuteur. It is not clearly evident that Dr. Tuteur was more credible than Dr. Hyers. Therefore, our duty is to defer to the Commission's determination of credibility. See *Max Shepard, Inc. v. Industrial Comm'n*, 348 Ill. App. 3d 893, 900-01 (2004).

¶ 43 Second, Duncan claims that Arbitrator Lee erred in the facts by stating that he, Duncan, "returned to baseline with respect to his condition" (to quote from Duncan's brief). For this bullet point as for his other bullet points, Duncan provides no citation to the record. See Ill. S. Ct. R. 341(h)(7), (i) (eff. Oct. 1, 2020). It does not appear that the arbitrator used the word "baseline" to express his own findings. Whenever he used the word "baseline" in his recommended decision (eight times, by our count), he either was describing Duncan's position or was summarizing the testimony of Dr. Roth and Dr. Hyers. As for Arbitrator Lee himself, he framed his own findings in terms of the abatement of symptoms:

> "Dr. Hyers testified credibly that shortly after both exposures, [Duncan's] symptoms abated, at least with regard to objective findings.
>
> Dr. Hyers did not dispute that [Duncan], having asthma, would be susceptible to further aggravations, as would be the case wi[th] all asthmatics. However, he did not feel that either exposure of 09/04/13 and 10/08/14 resulted in any permanent impact on [Duncan's] underlying asthma.
>
> It is found that Dr. Hyers' testimony is more compelling than that from Dr. Tuteur ***."

¶ 44 Is that credibility determination by Arbitrator Lee (and the Commission) reasonably defensible in the light of the record? In answering that question, let us begin with Dr. Hyers's conclusion that Duncan had preexisting asthma. We already have noted the multiple references, in Duncan's pre-exposure medical records, to wheezing, inhalers, and asthma. That Duncan was taking prescribed asthma medication logically suggests that he had asthma. As far back as November 23, 2005, he was prescribed Advair. Dr. Hyers testified that Advair typically was prescribed for asthma or chronic obstructive pulmonary disease and that there was no

indication in Duncan's medical records that he had chronic obstructive pulmonary disease. On February 16, 2009, in a medical intake form, it was represented, above Duncan's signature and a physician's illegible signature, that Duncan had experienced, in the foregoing 12 months, "[f]requent coughing," "[s]hortness of breath," and "[a]sthma or wheezing." A medical intake form dated February 14, 2011, made the same representations above Duncan's signature and above Dr. Roth's signature. Dr. Hyers testified, "When somebody starts wheezing, that's noising [*sic*] breathing, and then that's asthma until proven otherwise." Granted, not all of the medical intake forms in the record have those pulmonary or asthmatic symptoms circled. Even so, the record contains admissions of pre-exposure asthma or asthma-like symptoms, and Duncan had been taking asthma medicine.

¶ 45       In an asthma attack, the blood oxygen level might go down. Dr. Roth admitted that on July 28, 1999, 14 years before the initial exposure, Duncan's oxygen level was below normal. It was 68 mm Hg, whereas Dr. Roth "would usually 'like to see them between 80 and 100' " mm Hg, to quote from the Commission's decision. Dr. Roth admitted "that in August of 1999 there was a statement as to the possibility of a diagnosis of asthma." On June 18, 2003, Dr. Roth prescribed albuterol, a medication "designed to open up the airways and relax the spasm in the airways." She "admitted that an Albuterol inhaler is sometimes prescribed for asthma." On November 23, 2005, she prescribed Advair, another medication for asthma. She admitted that, "on 01/23/13, there was a specific discussion as to, 'asthma first diagnosed in adulthood,' " with " 'attacks once per year.' " On the basis of such evidence, a reasonable trier of fact could find that Duncan had asthma before the occupational exposures. Consequently, a reasonable trier of fact could believe Dr. Hyers when he opined that Dr. Tuteur's "diagnosis of irritant-induced asthma is incorrect, i.e., the workplace exposure did not cause his asthma."

¶ 46       In Dr. Hyers's opinion, the workplace exposures neither caused Duncan's asthma nor permanently aggravated it. The record appears to contain evidence that, soon after the exposures, Duncan's symptoms abated: most notably, the report by Dr. Kaul on October 8, 2014, and the discharge summary the day after. On the basis of such medical documentation, a reasonable trier of fact could believe Dr. Hyers when he testified that (1) Duncan's asthmatic symptoms abated shortly after the exposures and (2) the exposures only temporarily exacerbated his asthmatic symptoms without having any permanent effect on his underlying, preexisting asthma.

¶ 47       An objection might be raised that a temporary abatement of symptoms misses the point. The argument might run something like this. After the exposures, Duncan, like a typical person who has asthma, would continue experiencing asymptomatic stretches of time punctuated by bad spells, depending on when he encountered triggers. That is only to be expected. The salient point, however, is that because of the "remodeling" that Dr. Tuteur postulated, Duncan's asthmatic attacks would henceforth be more easily triggered. He was now, as compared to before, *hyper*susceptible to environmental irritants. As Dr. Tuteur put it in his deposition, "every time [that Duncan] has an exacerbation, he is subjected to what is called remodeling of the airways." Remodeling, Dr. Tuteur explained, was a "scarring of the airways, producing narrowing that is irreversible," with the result that "the best pulmonary function he can achieve is continually reduced because of the remodeling." The exposure to chemicals in September 2013, Dr. Tuteur opined, caused an acute injury of Duncan's airways, with inflammation and "the subsequent development of *serious* bronchial *reactivity*," more *proneness* to shortness of breath. (Emphases added.)

¶ 48       On cross-examination, Dr. Tuteur was asked whether there was any objective way

to determine whether bronchial tubes had been scarred:

> "Q. Do you have any way to go in with a tube or some kind of diagnostic test to determine whether there is, in fact, scar formation within the bronchial areas?
>
> A. Well, this concept was and is documented by research that is done by serial bronchial biopsies, via bronchoscope, mostly done in France.
>
> Q. But with regard to Mr. Duncan, has it been objectively—
>
> A. No. Because there is no therapeutic reason to do that. There is no— there would be no change in the therapeutic response. And there is a finite risk for bronchoscopy, with one in 1,000, one in 5,000 deaths."

Thus, according to Dr. Tuteur's own testimony, the only way to objectively prove his theory of remodeling was a series of biopsies by bronchoscope: a biopsy before the exposure and, for comparison, another biopsy after the exposure. Such bronchoscopal biopsies had not been performed on Duncan, and, hence, the postulated remodeling had not been empirically observed.

¶ 49        On cross-examination, Duncan's attorney asked Dr. Hyers:

> "Q. Do you agree with Dr. Tuteur's opinion that exacerbations of Mr. Duncan's condition can lead to remodeling of his airways?
>
> A. Exacerbations of asthma can lead to remodeling in general. I can't tell you what has happened with Mr. Duncan's airways and neither can Dr. Tuteur."

The Commission had the right to believe Dr. Hyers's testimony that remodeling of the bronchial tubes through scarring could occur but that such remodeling was, in Duncan's case, unproven. Dr. Tuteur himself admitted, in so many words, that, without a series of bronchial biopsies, remodeling was objectively unsubstantiated.

¶ 50        Third, Arbitrator Lee wrote, "As to the initial and claimed most serious exposure on September 4, 2013, [Duncan] was with Al Hoernis. He stated they were both in the same spot. They both cut the pipe." Duncan asserts that this is a misrepresentation of the record. He denies that Hoernis was in the same spot as he. In the arbitration hearing, however, Duncan was asked:

> "Q. Where were you and where was [Hoernis] when this pipe was cut and the material came out. *Were you both in the same spot*?
>
> A. *Yes*." (Emphases added.)

Arbitrator Lee cannot be fairly criticized for writing, "[Duncan] stated [that Hoernis and he] were both in the same spot," if that was exactly what Duncan said in his testimony. Even though Hoernis was not in the ditch with Duncan when the liquid first spilled out of the pipe, Hoernis was, according to Duncan's testimony, close enough to be "in the same spot." Also, it is worth bearing in mind that after Duncan left the ditch, Hoernis was the one who went into the ditch and bent down and collected a sample of the red, foamy liquid in a quart jar.

¶ 51        Fourth, in his decision, Arbitrator Lee remarked, "It is not disputed [Duncan] *has* a significant condition of asthma." (Emphasis added.) According to Duncan, that proposition is indeed disputed. The dispute on this point, however, is rather murky. It seems to be a dispute over terminology. Duncan presented the testimony of a pulmonologist, Dr. Tuteur, who opined that Duncan had "irritant induced bronchial reactivity." It is unclear what the difference is between irritant-induced bronchial reactivity and asthma. (In his bullet point, Duncan does not explain.) Dr. Tuteur testified:

> "And so I tend not to use the term asthma, because the definition—the working definition that physicians use individually for the term asthma is the basis of their experiential background. But I'd rather describe it as the pathophysiologic process

of bronchial reactivity and identify what induced it in a given patient." In other words, what nonpulmonologist physicians—"multiple blind men assessing the camel," as Dr. Tuteur described them—would call asthma, he would call bronchial reactivity, and that was what Duncan had. In common parlance, "asthma" is:

> "a chronic lung disorder that is marked by recurring episodes of airway obstruction (as from bronchospasm) manifested by labored breathing accompanied especially by wheezing and coughing and by a sense of constriction in the chest, and that is triggered by hyperreactivity to various stimuli (such as allergens or rapid change in air temperature)." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/asthma (last visited Nov. 3, 2021).

That definition seems a more elaborate way of describing "bronchial reactivity" in its plain sense. We do not mean to present ourselves as having medical expertise, but until a further explanation is provided, the distinction between "asthma" and "bronchial reactivity" could come across to a reasonable trier of fact as being semantic.

¶ 52      Ameren presented the testimony of another pulmonologist, Dr. Hyers, who had no difficulty with saying that Duncan had, quite simply, asthma. Dr. Hyers even agreed that the chemical fumes on September 4, 2013, aggravated Duncan's asthma. It was Dr. Hyers's opinion, however, that the asthma was preexisting and that the aggravation was transient instead of permanent.

¶ 53      Fifth, Arbitrator Lee (and the Commission, which adopted his decision) found Duncan's "credibility [to be] undermined by the fact that after what was alleged to [be] the most significant event on [September 4, 2013,] he returned to work within a couple of days

thereafter." Duncan criticizes this statement as being materially incomplete: although it is true that Duncan returned to work a couple of days afterward, his supervisor accommodated him by allowing him to stay in the truck whenever a gas leak had to be repaired. Even so, a reasonable trier of fact could question whether the exposure caused such severe scarring of the bronchial tubes as to "remodel" them and make Duncan permanently hypersensitive to a wide variety of fumes if, within two days afterward, he was able to return to work even with accommodation.

¶ 54        Sixth, Arbitrator Lee regarded Duncan's credibility as further diminished by the surveillance footage. The arbitrator wrote, "[A]t a time when [Duncan] was claiming significant and unabated symptoms, he was found on surveillance to be quite active outdoors, exposed to multiple fumes, without any eviden[ce] of impairment or difficulty relating thereto." Duncan disputes the factual accuracy of the phrase "quite active outdoors." "Quite active" is a relative description or a term of degree that, in this context, is not readily susceptible to an accusation of falsity. The point was that, even though the odor of a Magic Marker or of a two-month-old coat of paint (in Dr. Puricelli's office) allegedly put Duncan in respiratory distress, he was seen performing physical activities outside, in the midst of barbecue smoke and cigarette smoke, without apparent difficulty.

¶ 55        There was a similar discrepancy between what Duncan apparently told Dr. Tuteur and what his medical records stated. Arguably, it is implausible that before examining Duncan for a pulmonary condition, Dr. Tuteur never asked him if he had any previous problems with his lungs. Evidently, Duncan answered no, just as he must have answered no to the question of whether he had any "history of chronic sinusitis." ("There is no history of chronic sinusitis either for him or family," Dr. Tuteur wrote.) And yet, Duncan's medical records abound in references to previous pulmonary symptoms. He had been prescribed asthma medicine, Advair, as well as

an albuterol inhaler. Inhalers are popularly associated with breathing difficulties. How could

Duncan have taken puffs from an inhaler without being aware that he had pulmonary symptoms?

¶ 56        In short, "it is the responsibility of the Commission to judge the credibility of

witnesses[,] and we cannot substitute our judgment for that of the Commission merely because

different or conflicting inferences may also be drawn from the same facts." *LeFebvre v.

Industrial Comm'n*, 276 Ill. App. 3d 791, 798 (1995). The Commission did not have to find

Duncan or his family members to be entirely believable in their descriptions of his subjective

symptoms, at least when it came to the extreme severity of his symptoms.

¶ 57        This is not to deny that Duncan had asthmatic symptoms. Arbitrator Lee found that

he had preexisting asthma. In Dr. Hyers's opinion, Duncan had asthma that required medical care.

Dr. Puricelli opined that Duncan's reactive airway disease disabled him from pursuing any

occupation—but she never ventured an opinion on causation. There could be a question of what

Duncan's reaction to the red, foamy liquid in the ditch really showed. One explanation would be

his own explanation: that the red, foamy liquid *caused* him to contract reactive airway disease or

*caused* him to have permanently worse asthma than he had before. An alternative explanation,

however, might be that as Duncan grew older, his asthma worsened in its natural course, rendering

him more prone to temporary exacerbations—such as smelling the red, foamy liquid. We do not

see any evidence in the record that the toxicity of this red, foamy liquid was extraordinary in the

context of a gas journeymen's on-the-job exposures. We do not see any evidence that it was an

extraordinary event in the life of a gas journeyman to be exposed for 20 minutes to foul-smelling

liquids of such toxicity. Duncan informs us that in his 20-plus years as a gas journeyman he "was

*frequently* exposed to heat, cold, fumes, smokes, gases, particulates[,] and solvents." (Emphasis

added.) If, on its own, his asthma grew worse or more sensitive as he entered his sixties, there

might come a day when solvents and fumes started bothering him—in which case the temporary exacerbation, instead of proving that the exposure *caused* the bronchial reactivity, would be merely *symptomatic* of naturally increasing bronchial reactivity.

¶ 58        As Ameren points out, the chain-of-events method of proving causation is inapplicable because, in this case, there was no previous condition of good pulmonary health. See *International Harvester v. Industrial Comm'n*, 93 Ill. 2d 59, 63-64 (1982) (holding that "[a] chain of events which demonstrates a previous condition of good health, an accident, and a subsequent injury resulting in disability may be sufficient circumstantial evidence to prove a causal nexus between the accident and the employee's injury"). We acknowledge Duncan's observation that before the September 2013 exposure, he never missed work, except for the time when he contracted pneumonia. It does not follow, however, that his pulmonary health had been good. For years, he had suffered from shortness of breath, coughing, and wheezing, and he had been prescribed an inhaler.

¶ 59        There is evidence that Duncan's asthma has become substantially worse. It was for the Commission to decide what inferences or conclusions should be drawn from that evidence. We ought not to assume or take judicial notice that the reactivity of asthma, in its natural course, always stays the same over the course of a person's life. We are unaware of any expert testimony, nor does Duncan cite any, that asthma in its natural progression never worsens with age.

¶ 60                                III. CONCLUSION

¶ 61        The Commission's decision is not against the manifest weight of the evidence. Therefore, we reverse the circuit court's judgment and reinstate the Commission's decision.

¶ 62        Reversed and Commission decision reinstated.