**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (1st) 250231WC-U

Workers' Compensation
Commission Division
Order Filed: November 7, 2025

No. 1-25-0231WC

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION

_____

| | | |
|---|---|---|
| WILFREDO CRUZ, | ) | Appeal from the |
| | ) | Circuit Court of |
| Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 24L050367 |
| | ) | |
| | ) | Honorable |
| THE ILLINOIS WORKERS' COMPENSATION | ) | Daniel P. Duffy, |
| COMMISSION *et al.* (Rizza Cadillac, Appellee). | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Presiding Justice Holdridge and Justices Martin, Mullen, and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held:*  We affirm the circuit court's order confirming the Commission's decision, where the Commission's finding that claimant's current condition of ill-being was, in part, causally related to the work injury was not against the manifest weight of the evidence.

¶ 2    Claimant, Wilfredo Cruz, appeals from an order of the circuit court of Cook County, which confirmed the decision of the Illinois Workers' Compensation Commission (Commission)

affirming and adopting the arbitrator's decision that claimant's current condition of ill-being was, in part, causally related to the work injury. For the following reasons, we affirm the circuit court's order confirming the Commission's decision.

¶ 3                                    I. BACKGROUND

¶ 4     The following facts were adduced from the evidence and testimony presented at the November 22, 2022, arbitration hearing. Claimant testified that he worked for employer, Rizza Cadillac, as an auto technician for the past 40 years. On November 19, 2020, claimant was performing a tire rotation on a Cadillac Escalade. As he changed the last tire, he slipped, fell backwards, hit his head on the ground, and the tire fell onto his head. He testified that he lost consciousness. Claimant believed he injured his head, right eye, neck, and back. Claimant testified that he never received prior treatment for a concussion but acknowledged receiving an injection for lower back pain a few months prior to the accident. Claimant testified that he did not have any physical restrictions affecting his ability to work prior to the November 19, 2020, accident.

¶ 5     Claimant presented for treatment at the Silver Cross Hospital emergency department (ED) on November 20, 2020, complaining of pain in the back right side of his head, nausea, and headache. Claimant did not mention losing consciousness. The physical examination demonstrated no dizziness, altered level of consciousness, tingling, weakness, tenderness, or contusions. Claimant demonstrated full strength in his extremities and normal range of motion. A computed tomography (CT) scan of claimant's brain showed no acute hemorrhage, effects, shifts, or fluid. The results of the November 20, 2020, scan were normal and compared to a September 8, 2019, CT scan conducted after claimant presented to the ED with chest pain, dizziness, and occipital pain with radiating pain to the back of the neck and towards the eyes. ED staff diagnosed claimant with a likely concussion and closed head injury. ED staff also directed him to drink water and take

Tylenol and ibuprofen as needed for discomfort. He was released from work for two days and instructed to follow up with his primary care provider (PCP).

¶ 6    On November 24, 2020, claimant presented to his PCP, Dr. Michelle Danaher, complaining of headache, dizziness, nausea, and backache. The physical exam was normal. Dr. Danaher assessed claimant as suffering from a concussion without loss of consciousness and neck pain. Dr. Danaher prescribed ibuprofen and cyclobenzaprine and recommended claimant remain off work. On December 2, 2020, Dr. Danaher instructed claimant to return to the Silver Cross Hospital ED following ongoing complaints. Dr. Danaher also referred claimant to a neurologist, Dr. Georgios Filiadis, who noted claimant's complaints of blurred vision, dizziness, and right temporal parietal occipital pain that claimant rated 6/10. Claimant also reported losing consciousness during the accident, which Dr. Filiadis noted had not been reported during claimant's initial visit on November 20, 2020. A second CT scan was conducted and showed no acute intracranial hemorrhage and was noted as normal and stable. Claimant was diagnosed with post-concussion headache.

¶ 7    On December 4, 2020, claimant presented to neurologist Dr. Samina Bokhari. Claimant previously presented to the neurology clinic 14 months prior to the accident on September 11, 2019. At that time, claimant complained of experiencing dizziness, head pressure, and nausea a few days prior. Claimant reported an ongoing 10-year history of "visual symptoms" that occurred once every two months wherein he experienced a "visual aura that usually starts on one side of [his] visual field and gradually moves on to the central visual field" followed by blurred vision. During his December 4, 2020, visit, claimant stated he had not experienced visual aura the past several months, but now complained of forgetfulness, right-sided head pain, intermittent dizziness and lightheadedness, and sensitivity to light since the accident. Dr. Bokhari diagnosed intractable

post-traumatic headache, post-concussion syndrome, and cervical paraspinal muscle spasm. Claimant's physical exam was otherwise normal. Dr. Bokhari excused claimant from work.

¶ 8 On December 10, 2020, claimant underwent an electroencephalography (EEG). The EEG study was normal with no consistent focal asymmetries, epileptiform discharges, or electrographic seizures. On December 14, 2020, a magnetic resonance imaging (MRI) scan of claimant's brain demonstrated a very small focus of increased Fluid-Attenuated Inversion Recovery (FLAIR) signal in the right inferior cerebellum noted as a possible tiny old lacunar infarct/ischemia. The MRI was otherwise unremarkable. Dr. Bokhari recommended pain management and vestibular therapy. On December 21, 2020, claimant presented to Dr. Yousuf Sayeed. Dr. Sayeed prescribed gabapentin and diagnosed occipital neuralgia of the right side and post-concussion syndrome. Claimant testified that his symptoms worsened during treatment with Dr. Sayeed and that he would "go blind every so often" in his right eye.

¶ 9 On January 13, 2021, claimant presented to physician's assistant, Ryan Enger, for pain management. Claimant reported headaches to the right side of his head and the occipital and frontal region. Claimant stated he could still perform daily activities such as eating, bathing, using the bathroom, dressing, and rising from a bed or chair. Claimant's neurological exam was normal, and he was advised to continue normal activities to improve functionality. Work restrictions were deferred to neurology.

¶ 10 On January 26, 2021, claimant returned to Dr. Bokhari complaining of twitching in his left arm, tenderness to spots of his head, radiating pain down his neck into his shoulder, and low back pain. He also reported clear liquid discharge coming out of his ear and a swooshing noise. Dr. Bokhari noted claimant had a normal gait pattern, no acute distress, a comfortable appearance, and good eye contact. Claimant did not complain of delusions or hallucinations. Dr. Bokhari discussed

the objective studies with claimant and found he was most likely suffering from post-concussion syndrome. Dr. Bokhari recommended vestibular therapy, deep tissue massage, and ordered a cervical MRI. The MRI indicated a reversal of the usual cervical lordosis, possibly related to muscle spasm. It also showed multilevel degenerative cervical spondylosis without significant spinal canal stenosis or cord signal abnormality. Claimant presented to the otolaryngology department to address the ear drainage. No hearing loss or vertigo was reported, but claimant's left ear showed eczema so he was provided Betamethasone cream. Claimant's diagnosis continued to be post-concussion syndrome.

¶ 11    Claimant received an occipital nerve block on February 22, 2021. Symptoms initially worsened, but eventually subsided and daily activities were reportedly tolerable. Claimant testified that the injections provided no lasting relief. On March 17, 2021, claimant returned to Dr. Bokhari complaining of left-sided neck pain, despite taking gabapentin and undergoing physical therapy. Dr. Bokhari noted claimant's gait, affect, appearance, mental status, memory, insight, speech, language, cranial nerve, sensory system, and motor system were normal. Dr. Bokhari noted no abnormal movements but identified muscle spasm in the left cervical paraspinal region. Dr. Bokhari referred claimant to a spine surgeon.

¶ 12    On March 3, 2021, claimant presented to Dr. Ashraf Hasan complaining of neck, head, and back pain. Claimant had sought treatment from Dr. Hasan dating back to 2015. In 2020, claimant reported sharp, crackling pain in his neck and lower back that a Medrol Dosepak and physical therapy did not relieve. An MRI was conducted and claimant reportedly did not want to pursue surgical intervention. Dr. Hasan treated claimant with a sacroiliac joint injection. During his March 3, 2021, visit, claimant reported no relief from the occipital nerve blocks administered by Dr. Sayeed. Dr. Hasan noted normal strength and range of motion with some reported tenderness along

the cervical and lumbar spine region and pain with lateral rotation. Dr. Hasan diagnosed cervicalgia in the neck, low back pain, degeneration of the lumbar intervertebral disc, lumbosacral spondylosis without myelopathy, cervical spondylosis without myelopathy, cervico-occipital neuralgia, and myofascial pain. Dr. Hasan administered facet joint injections in April and May 2021. In June 2021, claimant reported minimal improvement from the injections and continuing symptoms.

¶ 13    On May 27, 2021, employer sent claimant to Dr. Jeffrey Kramer for an Independent Medical Evaluation (IME). Dr. Kramer reviewed claimant's medical records. Dr. Kramer diagnosed claimant with post-concussion syndrome with persistent left peripheral vestibulopathy, and bilateral occipital neuralgia, more on the right. He noted claimant's past history of intermittent symptoms of 10 years of visual aura with blurred vision and occasional dizziness. Claimant's physical exam was otherwise normal. Dr. Kramer opined that claimant was not at maximum medical improvement (MMI) and that treatments to date were reasonable, necessary, and causally related to the work injury. He recommended vestibular therapy, home exercises, therapy for cervical range of motion, and facet joint blocks.

¶ 14    On July 19, 2021, claimant presented to Dr. Mohammed Khan at the Silver Cross Neuroscience Institute complaining of right-sided neck pain, vertigo, blurry vision, and occipital headaches. Claimant denied losing consciousness at the time of the accident. Dr. Khan reviewed claimant's diagnostic studies, examined claimant, and noted that claimant's brain showed no structural damage, his cervical spine showed no disc herniations, his gait was stable, and his upper extremity lacked radiculopathy. Dr. Khan diagnosed cervical strain and recommended physical therapy.

¶ 15    On July 20, 2021, claimant presented to Dr. Kenneth Moore at the University of Illinois. Dr. Moore noted that he had not encountered a patient with the same grouping of symptoms and

called it a "very UNUSUAL case." On a follow-up visit, Dr. Moore diagnosed claimant with traumatic brain injury without loss of consciousness. Claimant reported hearing music when the furnace blower turns on. Sensory and neural testing was normal. Dr. Moore concluded that claimant did not have any anatomic symptoms and did not meet the criteria for any recognized primary headache disorder. On August 15, 2021, Dr. Moore diagnosed claimant with monocular vision loss, noting that claimant's blindness symptoms were unlikely related to his work injury and usually a stroke warning. Claimant's wife contacted Dr. Moore a few weeks later indicating tests ruled out stroke.

¶ 16    On September 1, 2021, claimant returned to Dr. Bokhari complaining of headaches and dizziness. Claimant also reported transient loss of vision in the right eye and auditory hallucinations of hearing music and birds chirping. Claimant reported establishing care with Dr. Moore at the University of Illinois. Claimant stated that prescribed Indomethacin and Lamictal did not relieve his symptoms. Dr. Bokhari again noted that, aside from his complaints, claimant was otherwise normal. A third CT scan was normal. A follow-up EEG demonstrated a very mild focal abnormality over the left frontotemporal region suggestive of a focal disturbance of function. The study was otherwise normal. Dr. Bokhari suggested a referral for psychiatric services if the auditory hallucinations persisted, but claimant did not pursue the services.

¶ 17    On September 13, 2021, claimant presented to Dr. Thomas Deutsch at Rush Medical Ophthalmology Associates complaining of blurred vision with episodes occurring throughout the day, a couple days a week. Dr. Deutsch diagnosed claimant with vitreous detachment in the right eye with no indication of stroke, and post-concussion syndrome. Dr. Deutsch recommended hot compresses on his eye.

¶ 18    On September 29, 2021, employer sent claimant to Dr. Kern Singh for an IME. Claimant

complained of pain that therapy and injections failed to relieve. Dr. Singh reviewed Dr. Kramer's May 27, 2021, IME report, Dr. Moore's notes, and the February 18, 2021, MRI. Dr. Singh diagnosed soft tissue muscle strain of the cervical and lumbar spine which had resolved. He opined that claimant reached MMI and could return to work. Dr. Singh noted he could not objectify claimant's pain complaints regarding the spine, which were nonanatomic in nature.

¶ 19    On October 5, 2021, Dr. Kramer conducted a follow-up IME. He reviewed additional records from Dr. Moore and Dr. Hasan, noting the facet block injections had minimal impact. Claimant reported shooting pain in the right occipital region and right temporal region. Claimant's physical exam was normal, with an antalgic gait with his left hip elevated. Dr. Kramer diagnosed claimant with occipital neuralgia on the right, temporary aggravation of underlying degradation of the cervical region, and associated scalp tenderness. Dr. Kramer noted that "[claimant's] current pain complaints are markedly out of proportion to any objective findings." He opined that claimant's symptoms were "exaggerated" and related to underlying degenerative conditions unrelated to the work injury. Dr. Kramer believed claimant would reach MMI by July 1, 2021. Claimant's workers' compensation benefits ended October 25, 2021. He continued treatment through group health insurance.

¶ 20    On November 1, 2021, claimant presented to Dr. Dore Robinson complaining of neck pain traveling down to his left leg, and pain along the left side of his low back. Dr. Robinson diagnosed claimant with cervical and lumbar radiculopathy and recommended physical therapy and pain management. Dr. Robinson responded to Dr. Singh's IME and opined the work accident was consistent with claimant's complaints and caused an aggravation of claimant's preexisting underlying degenerative conditions. On November 23, 2021, claimant saw Dr. Joel See for pain management. Dr. See administered a lumbar epidural steroid injection a few weeks later.

¶ 21    On December 9, 2021, claimant presented to Dr. Molly O'Shaughnessey at the ophthalmology department of Duly Health Care complaining of floaters, vision greying out, right eye pain, and decreased visual acuity. Dr. O'Shaughnessey diagnosed claimant with vitreous degeneration and detachment, dry eye syndrome, age-related cataracts, and visual disturbances. Glasses were recommended and it was noted that Dr. Deutsch had prescribed glasses, but claimant did not fill the prescription. Claimant's ocular health was unremarkable and unlikely responsible for the greying of vision. Dr. O'Shaughnessey's neuro exam noted that claimant denied headaches.

¶ 22    On December 20, 2021, claimant returned to Dr. Robinson complaining of sharp stabbing pain from the center of his head around his eyes traveling down his neck into his lower back and left leg, and intermittent blindness. Dr. Robinson recommended chiropractic treatment which claimant testified did not provide him with relief.

¶ 23    On March 20, 2022, claimant presented to Dr. Rani Chovatiya, Dr. Ankit Bhatia, and Dr. Dang[1] for pain management for headaches. Claimant's physical exam was normal. The doctors diagnosed claimant with occipital neuralgia on the right side and recommended injections. Claimant returned to these doctors and Dr. Moore throughout 2022 for pain management and complained of auditory changes, back pain, confusion, dizziness, headaches, lightheadedness, neck pain, vertigo, and vomiting. Claimant continued to receive injections, nerve blocks, and therapy with no reported improvement despite normal physical exams.

¶ 24    At the November 21, 2022, arbitration hearing, claimant testified that he was awarded social security disability benefits and has not been released to work. Claimant agreed his four brain scans were normal, and confirmed undergoing several MRI scans of his brain, neck, and lower back. Claimant acknowledged that his lower back was last treated two months before the accident.

---

[1]Dr. Dang's first name does not appear in the record.

¶ 25    The arbitrator's decision was issued on July 7, 2023. Relevant to the issue on appeal, the arbitrator found that claimant's condition of ill-being was, in part, causally related to the November 19, 2020, work injury. The arbitrator found that all of claimant's causally-related injuries were resolved: post-concussion syndrome, occipital neuralgia, cervical strain, and lumbar strain. The arbitrator found claimant's visual disturbances and auditory hallucinations were not related to the work accident. The arbitrator stated that the "pivotal issue on causal connection is to what degree are [claimant's] conditions related to his work accident and to what degree his restrictions are valid" and based his finding on claimant's testimony, medical records, and the opinions of Drs. Kramer and Singh.

¶ 26    The arbitrator noted that claimant had six diagnostic studies of his head/brain and three of his spine. The arbitrator noted the brain scans were normal, and all the EEG studies, except for the March 28, 2022, EEG, which "might show a degenerative finding consistent with [claimant's] age." The arbitrator further found that the six diagnostic studies of claimant's brain failed to "demonstrate any structural changes which can be said to be related to the accident at issue" and found the "lack of objective evidence of brain trauma *** noteworthy." The arbitrator noted the lack of "physical evidence of significant trauma," such as tenderness, abrasion, contusion, or swelling in the records from the November 20, 2020, and December 2, 2020, emergency department visits, and the November 24, 2020, primary care provider visit.

¶ 27    The arbitrator determined that the medical records did not support a causal relation between claimant's visual/auditory issues and the accident. The arbitrator noted claimant's history of visual disturbances prior to the accident, lack of persuasive records relating his retina detachments and transitory blindness to the accident, and failure to obtain the recommended prescription eyeglasses to improve his vision. Regarding his auditory hallucinations, the arbitrator found they were not

related to the work injury and "do bring into question the accuracy of [claimant's] perceptions regarding all of his current complaints." Lastly, the arbitrator questioned claimant's credibility because he presented with an antalgic gait during his second visit with Dr. Kramer, which was not present during his first visit and was "inconsistent with contemporary and prior and subsequent medical records." The arbitrator found the opinions of Drs. Kramer and Singh persuasive concerning claimant's neurologic/head/brain and spine conditions, as well as their opinions that claimant reached MMI: Dr. Singh finding MMI for claimant's neck/back as of September 9, 2021, and Dr. Kramer finding MMI for claimant's neurologic/head brain conditions as of October 6, 2021. The arbitrator awarded reasonable and necessary medical expenses of $18,869.30 pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2020)). The arbitrator awarded temporary total disability benefits of $968.04/week for 47 5/7 weeks, commencing November 20, 2020, through October 19, 2021. The arbitrator awarded employer a credit of $46,189.33. Prospective medical care was denied.

¶ 28    On June 14, 2024, the Commission, with one Commissioner dissenting, affirmed and adopted the arbitrator's decision.[2] On January 15, 2025, the circuit court of Cook County confirmed the Commission's decision. Claimant timely appealed.

¶ 29                                        II. ANALYSIS

¶ 30    On appeal, claimant argues that the arbitrator and Commission's decisions were against the manifest weight of the evidence because claimant was in good health prior to the accident, treating physicians never released claimant to work, and the arbitrator and Commission relied on Dr. Singh and Dr. Kramer's opinions despite conflicting medical opinions. Claimant contends his "condition

---

[2]The Commission modified the arbitrator's decision by adding the following sentence to a paragraph: "Petitioner is entitled to temporary total disability benefits commencing November 20, 2020, through October 19, 2021, pursuant to Section 8(b) of the Act."

and ability to work in any capacity completely deteriorated after the work injury." Claimant further argues that Dr. Singh failed to review medical records pertaining to claimant's neck and back and failed to conduct a thorough examination. Claimant argues that Dr. Kramer ignored claimant's complaints while other treating physicians found the medical treatment claimant received for post-concussion syndrome necessary and directly caused by his work injury. Employer rebuts that all the objective studies were essentially normal, the Commission correctly relied on the IME doctors, and the Commission found claimant lacked credibility. Specifically, employer contends the objective studies show "no measurable defect whatsoever" to claimant's brain and do not "explain the subjective complaints" of disability to claimant's neck and back. Employer further argues that the Commission properly relied on Dr. Kramer and Dr. Singh's opinions where they found no objective support for claimant's subjective complaints which were "markedly out of proportion to any objective findings." Finally, employer argues the Commission found claimant lacked credibility because of his prior 10-year history of auditory and visual issues, failure to fill his eyeglass prescription, and demonstration of an antalgic gait at his second visit to Dr. Kramer despite five different physicians noting a normal gait pattern during their examinations.

¶ 31     We review the Commission's factual determinations under the manifest-weight-of-the-evidence standard. *Orsini v. Industrial Comm'n*, 117 Ill. 2d 38, 44 (1987). A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *Bassgar, Inc. v. Illinois Workers' Compensation Comm'n*, 394 Ill. App. 3d 1079, 1085 (2009). The test is whether the evidence is sufficient to support the Commission's findings, not whether this court, or any other tribunal, might reach an opposite conclusion. *Pietrzak v. Industrial Comm'n*, 329 Ill. App. 3d 828, 833 (2002). Moreover, we may affirm the Commission's decision on any basis supported by the record regardless of the Commission's findings or its reasoning. *Dukich v. Illinois*

*Workers' Compensation Comm'n*, 2017 IL App (2d) 160351WC, ¶ 43 n.6. In resolving factual matters, it is within the province of the Commission to assess the credibility of the witnesses, resolve conflicts in the evidence, assign weight to be accorded the evidence, and draw reasonable inferences from the evidence. *Hosteny v. Illinois Workers' Compensation Comm'n*, 397 Ill. App. 3d 665, 674 (2009). This is especially true with respect to medical issues, to which we owe the Commission heightened deference because of the expertise it possesses in the medical arena. *Long v. Industrial Comm'n*, 76 Ill. 2d 561, 566 (1979); *Freeman United Coal Mining Co. v. Illinois Workers' Compensation Comm'n*, 386 Ill. App. 3d 779, 782-83 (2008). We will affirm the Commission's decision if there is any basis in the record to do so, regardless of whether the Commission's reasoning is sound or correct. *Freeman United Coal Co. v. Industrial Comm'n*, 283 Ill. App. 3d 785, 793 (1996).

¶ 32    Here, we cannot say the Commission's decision was against the manifest weight of the evidence. In affirming and adopting the arbitrator's decision, the Commission found that claimant's condition of ill-being was, in part, causally related to the work injury. However, the Commission found that all of claimant's causally-related conditions resolved: post-concussion syndrome, occipital neuralgia, cervical strain, and lumbar strain. The Commission found that the numerous examinations, scans, and tests demonstrated no objective basis for claimant's subjective reported symptoms. The Commission relied on the opinions of Dr. Singh and Dr. Kramer, and found them more persuasive than other treating physicians. The Commission found their opinions credible where Dr. Singh could not objectify claimant's complaints and Dr. Kramer opined that "[claimant's] current pain complaints are markedly out of proportion to any objective findings." Both doctors placed claimant at MMI.

¶ 33    The Commission also weighed the evidence when it found claimant's auditory and visual issues not causally related to the work injury. The Commission noted claimant's over 10-year history of dealing with these issues, even before the accident occurred. Claimant was eventually referred for psychiatric treatment, though he did not pursue it.

¶ 34    Finally, the Commission assessed and questioned claimant's credibility where he presented with an antalgic gait during his second visit with Dr. Kramer, which was not present during his first visit and was "inconsistent with contemporary and prior and subsequent medical records." Weighing and resolving conflicts in the evidence, assessing witness and medical opinion credibility, and drawing reasonable inferences are all within the purview of the Commission. *Hosteny*, 397 Ill. App. 3d at 674. Where the evidence is sufficient to support the Commission's findings and the opposite conclusion is not clearly apparent, we will not disturb the decision of the Commission, even if we might reach an opposite conclusion. *Bassgar*, 394 Ill. App. 3d at 1085; *Pietrzak*, 329 Ill. App. 3d at 833.

¶ 35                                III. CONCLUSION

¶ 36    For the reasons stated, we affirm the circuit court's order confirming the decision of the Commission.


¶ 37    Affirmed.